PUBLISHERS PAPER CO. et al,
*Appellants,*
*v.*
DAVIS, *Respondent.*
(No. 88, 997, CA 5751)
559 P2d 891

Allan Hart, Portland, argued the cause for appellants. With him on the briefs were Lindsay, Nahstoll, Hart & Krause, Portland.

Bruce R. DeBolt, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Fort, Presiding Judge, and Tanzer and Richardson, Judges.

RICHARDSON, J.

## RICHARDSON, J.

The underlying proceeding in this appeal was brought under ORS chapter 756 to set aside an order of the public utility commissioner wherein he had granted increased electric rates to Portland General Electric (PGE). Plaintiffs are large industry customers of PGE and brought suit in the circuit court pursuant to ORS 756.580 to set aside the order. They appeal to this court pursuant to ORS 756.610 from an adverse decision affirming the commissioner's order. The issue on appeal is whether the "rate spread" provision of the public utility commissioner's order contains adequate findings of fact and conclusions of law.

Portland General Electric filed revised tariff schedules designed to increase revenues by 10.2 percent. To increase future revenues the desired amount PGE proposed increases of 10.2 percent in residential rates, 10 percent in commercial rates, 12.1 percent in medium industrial rates, and 14.2 percent in large industrial rates. The differentiation in percentage increases among the various classes of consumers to obtain a desired total revenue increase is called the "rate spread."

The commissioner suspended these rates and conducted a hearing. Plaintiffs in this case, four large industrial customers of PGE, participated in the hearing as intervenors. The public utility commissioner's staff also participated, and presented a proposed rate spread different from that in PGE's revised schedules. The staff proposed an increase of 40.1 percent in medium industrial rates, and an 81.8 percent increase in large industrial rates with no increase in commercial or residential rates.

The commissioner entered his order allowing PGE to file new schedules producing an aggregate increase of 9.7 percent in revenues. The rate spread was significantly different from PGE's original proposal, the residential rates being increased 5.6 percent,

commercial 4.1 percent, medium industrial 21.4 percent, and large industrial 52.6 percent.

The commissioner in his order determined that customers of the utility should pay a rate which reflected the cost to the utility of providing energy to that class of customer. It was necessary to select a "cost" standard to apply in setting the "rate spread." The utility utilizes four classifications of customers in determining cost factors; residential, commercial, medium industrial and large industrial. The order adopted long run incremental cost (LRIC) as the relevant cost standard for evaluating the proposed increases. LRIC is an estimate of the costs the utility will incur over a period of time, usually ten years, in constructing additional facilities and in operating these additional facilities to satisfy increased future energy demand. These costs are allocated to the various consumer classes. In other words the utility makes an estimate of the cost of future construction and operation of generating facilities needed in order to meet the future demands for energy from each specified class of consumer, i.e., residential, commercial, medium industrial and large industrial. By increasing present rates to reflect these future costs it is hoped the consumers will respond by decreasing their demand thereby reducing the need for increased investment in the future.

Testimony during the hearing indicated some classes of consumers are thought to be able to adjust their demand for energy in response to the pressure of increased prices. Other classes are thought to be less capable of altering consumption, and would not respond to a price increase. This is the concept of "price elasticity" or "price sensitivity."

The public utility commissioner's staff recommended placing the rate for industrial consumers at a figure equal to 85 percent of LRIC with no recommended increase in residential or commercial rates. The commissioner's order provided for an increase in

industrial rates equal to 75 percent of LRIC, an increase in the rate of 52.6 percent.

Plaintiffs concede that there is substantial evidence on the record to support the use of the LRIC concept as the cost standard in this case, and to support the LRIC calculated for each consumer class. They do not contest on appeal the commissioner's use of LRIC as a rate standard.

This appeal challenges the commissioner's order as being deficient in findings of fact and conclusions of law respecting the application of LRIC to produce a disproportionately higher rate for industrial customers.

We must first determine the scope of our review of the order.

In *Pacific N. W. Bell v. Sabin,* 21 Or App 200, 534 P2d 984, Sup Ct *review denied* (1975), we characterized the function of the utility regulation including rate making as a legislative function, a function, however, not without limits. The authority given to the public utility commissioner is exercised within the bounds of both the state and federal constitutions. In addition the express delegation of power flowing from the legislature to the commissioner contains express limitations on the broad powers to regulate utilities.

ORS 756.040 requires the public utility commissioner to represent the customers of a public utility and the public generally in matters respecting rates and services and to obtain for them fair and reasonable rates. The commissioner is not obligated to employ any specific formula in arriving at his rate decision.

A challenge to this broad authority through the medium of a "suit in equity" pursuant to ORS 756.580 provokes merely a review of the commissioner's functions with the power of the circuit court limited. "* * * [T]he court shall not substitute its judgement for that

of the commissioner as to any finding of fact supported by substantial evidence. * * *" ORS 756.598(1).

■ An order issued by the commissioner following a hearing must comply with ORS 756.558(2).

"After the completion of the taking of evidence, and within a reasonable time, the commissioner shall prepare and enter findings of fact and conclusions of law upon the evidence received in the matter and shall make and enter his order thereon. * * * "

This requirement is made to apply to hearings on all matters coming before the commissioner (ORS 756.518) and would include a rate hearing.

■ The recitation of finding must be sufficiently specific in order that the reviewing court does not have to delve into the record to discern the inferences the commissioner may have drawn in arriving at his conclusion. *Pacific Tel. & Tel. Co. v. Flagg,* 189 Or 370, 220 P2d 522 (1950). The commissioner is the finder of fact not the court and his findings will be binding on the court if supported by substantial evidence. The clear implication of the duty of the commissioner to make findings and the duty of the court to review is that the order must be sufficient for purposes of judicial review.

In *Valley & Siletz R. R. Co. v. Flagg,* 195 Or 683, 711, 247 P2d 639 (1952), Justice Rossman summarized the needs of the court in reviewing a commissioner's order.

"The question remains as to the needed scope of the findings which the commissioner must enter. Since the statute from which we have quoted requires the commissioner to enter findings of fact, and since another statute which we cited provides for judicial review, the findings ought to set forth sufficient facts so that the reviewing court can prudently discharge its duty and not experience a sense of frustration through inability to get at the facts. The circumstance that the evidence is in the transcript and that the court, by weighing it, can determine for itself 'the facts' does not suffice. The agency is the fact finder, and the undigested transcript is

not a substitute for a set of findings of fact. The provisions requiring the commissioner to enter findings and the courts to grant judicial review should afford the commissioner a dependable chart indicating the scope to which his findings should extend. His knowledge of the issues which the parties presented to him should indicate still further the needed breadth and sweep of his findings. Leaving an issue of fact in such a state that the agency's reaction to the issue can be discerned only through implicaiton does not suffice: *Atchinson T. & S. F. R. Co. v. United States,* 295 US 193, 55 S Ct 748, 79 L Ed 1382, and *Panama Refining Co. v. Ryan,* 293 US 388, 55 S Ct 241, 79 L Ed 446; see, also, annotation 146 ALR 209 at 235. Nor should a court be put in a position wherein it is forced to ferret out the facts or seek them through engaging in mathematical calculations of a kind for which special training is required."

*See also Mt. Hood Stages, Inc. v. Hill,* 243 Or 283, 413 P2d 392 (1966); *Mitchell Bros. Trk. Lines v. Hill,* 227 Or 474, 363 P2d 49 (1961); *American Can Co. v. Davis,* 28 Or App 207, 559 P2d 898 (1977); *Bekins Moving & Storage v. P.U.C.,* 19 Or App 762, 529 P2d 413 (1974).

■ In addition to a recitation of the factual basis of the decision the commissioner's order must disclose a rational relationship between the facts and the legal conclusion he reaches. This principle was cogently and succinctly enunciated by this court in *Home Plate, Inc. v. OLCC,* 20 Or App 188, 530 P2d 862 (1975).

"If there is to be any meaningful judicial scrutiny of the activities of an administrative agency—not for the purpose of substituting judicial judgment for administrative judgment but for the purpose of requiring the administrative agency to demonstrate that it has applied the criteria prescribed by statute and by its own regulations and has not acted arbitrarily or on an ad hoc basis—we must require that its order clearly and precisely state what it found to be the facts and fully explain why those facts lead it to the decision it makes. * * *"

*See also McCann v. OLCC,* 27 Or App 487, 556 P2d 973 (1976).

■ This does not require that we agree with the inferences drawn or the reasoning expounded by the agency whose order we are reviewing. We test the order to determine if there are sufficient findings of fact and conclusions of law to allow testing of the agency's actions against its grant of power and to determine if "* * * an agency's reasoning [is] rational, that is not irrational, nonrational or fallacious. * * *" *McCann v. OLCC, supra* at 503.

■ Although *Home Plate* involved an administrative decision which arose under Oregon Administrative Procedures Act[1] the principle applies with equal force to orders of the commissioner issued pursuant to ORS chapter 756. The requirements of judicial review are substantially equivalent.

Applying these decisional principles to the commissioner's order we find it sufficiently meets the test.

■ ■ Setting rates to produce sufficient revenue to allow a utility a fair return is only one of the functions assigned to the commissioner in rate making. As the commissioner noted in his order he is to ensure that no utility collects from any person, more or less compensation for any service than is collected from any other person for like and contemporaneous service. Implicit in his duty to set reasonable rates, to look after the interest of the consumer and guard against discrimination is the duty to see that customers are treated fairly as respects the rate spread and design.

The commissioner set forth in his order one of the principles he adopted in the rate spread decision:

"* * * The touchstone of ratemaking, and of the Commissioner's responsibility to prevent rate discrimination, is the concept that each customer should pay the costs imposed upon the company in meeting that customer's energy needs."

---

[1] ORS 183.470

ORS 183.315 exempts the public utility commissioner from certain provisions of the Administrative Procedures Act including ORS 183.470.

The relevant cost standard for the rate spread decision, the commissioner found, was LRIC which he selected from among the several cost standards presented by the evidence. The LRIC evidence separated the cost estimates by consumer classifications. The commissioner made the finding in his order that each classification of consumer receives its own distinct form of service and has "its own distinct set of 'circumstances.' " These distinctions are the basis for the different classifications. The rate spread was expressed in terms of a rate for each class of consumer equal to a percentage of the LRIC estimate assigned to each particular class. Such classification is the basis of setting different rates for each consumer class and thereby gives the commissioner a basis to guard against discrimination in rates.

The issue facing the commissioner once he had selected LRIC as the cost basis was to allocate the total rate among the various classes of customer. This involved a two step process. First, determining if a single class of consumer should bear a greater portion of the rate increase and if so which class, and secondly, what rates should be set for each consumer class. The staff recommended the rate be spread by an increase equal to 85 percent of LRIC for industrial customers and no increase to residential or commercial consumers. In response to this recommendation the commissioner said

"* * * Although this recommendation may have merit from an economic standpoint, the Commissioner must also recognize the desirability of minimizing abrupt changes in cost responsiblity [sic] to the different customer classes."

He then concluded residential and commercial customers should bear a portion of the revenue requirement and set rates for each customer class including the here disputed rate equal to 75 percent LRIC for industrial classes. In essence he found the staff recommended increase acceptable to accomplish the economic aims but determined bringing industrial

customers closer to their full cost responsibility would be too "abrupt." It is well within the commissioner's discretion to accomplish that policy by reducing the rate below what would mathematically accomplish the expressed purpose of having a customer pay the costs of service to him.

In determining that industrial customers should pay a rate which was increased by a greater amount than other classifications the commissioner found industrial customers had not borne their fair share of previous increases in rates. He made a specific finding that since 1962 rate increases involving PGE had been "* * * borne primarily by residential customers, with industrial customers being assessed the least cost responsibility despite the reversal in industry cost conditions. * * *"[2] The greater percentage increase was not primarily to place industry ahead of other classes but to bring them more nearly into parity[3]

---

[2] The commissioner made findings reflected in the following two tables which compare the increases in rates assignable to each class of consumer.

(1) A comparison of average rates per KWH in 1962 compared to the average rates in effect just prior to the rates authorized in this proceeding.

| | Cents per KWH | | |
| | 1962 | Present Rates | Increase |
|---|---|---|---|
| Residential | 1.14 | 1.52 | .38 |
| Commercial | 1.33 | 1.50 | .17 |
| Medium Industrial | 0.65 | 0.75 | .10 |
| Large Industrial | 0.38 | 0.48 | .10 |

(2) A comparison of the average rates in 1962 with the rates authorized in this proceeding.

| | Cents per KWH | | |
| | 1962 | Present Rates | Increase |
|---|---|---|---|
| Residential | 1.14 | 1.60 | .46 |
| Commercial | 1.33 | 1.56 | .23 |
| Medium Industrial | 0.65 | 0.91 | .26 |
| Large Industrial | 0.38 | 0.73 | .35 |

[3] Mathematical calculation discloses the following percentages of LRIC borne by each customer classification as a result of the rate set by the commissioner in this challenged order.

| | |
|---|---|
| Residential | 1.60¢ per KWH = 57% LRIC |
| Commercial | 1.56¢ per KWH = 101% LRIC |
| Medium Industrial | 0.91¢ per KWH = 75% LRIC |
| Large Industrial | 0.73¢ per KWH = 74% LRIC |

respecting each customer's responsibility for covering LRIC. Although plaintiffs disagree with these findings and dispute the reasoning of the commissioner they are nevertheless findings of fact and rational reasons toward conclusions of law.

The process of setting rates, as we have said, is a purely legislative function which involves broad discretion in selecting policies and methods of implementation. The commissioner must have a certain latitude in the exercise of his discretion to select from competing policies. The spreading of the rate within the rate plan to accomplish the expressed aims of relating the rate to cost, of having industry pay a fairer percentage of rate increases and minimizing the abruptness of restructured rates, is not susceptible of precise mathematical calculation. It involves judgment on a myriad of factors.

The industrial rate equal to 75 percent LRIC was within the discretion of the commissioner. It will be recalled the staff recommended 85 percent LRIC and PGE recommended 56 percent LRIC for industrial consumers. The commissioner's rate was not an arbitrary figure but was related to costs, i.e., a percentage of LRIC, was less than the rate recommended by the staff, which he found had economic merit, was designed to assign a fairer portion of rate increases to industry, and was softened to minimize the abruptness of trying to more closely relate rate to costs. Additionally it was designed to produce the desired revenue for the utility company. The reasoning leading to the setting of the rate is rationally related to the commissioner's expressed aims and the findings of fact.

■ ■ Plaintiffs argue the order is deficient because it failed to mention "price elasticity" or to resolve conflicts in evidence concerning price elasticity. This evidence related to the need to reduce energy demand and thereby reduce capital expenditures and future energy requirements; in essence an energy conservation measure. The plain inference from the lack of

discussion in the order of price elasticity is that the commissioner did not regard this theory and evidence as significant in his rate spread decision. He selected a "cost to customer" criterion and an aim of bringing industry closer to its fair share of rate increases. The commissioner is not required to discuss every reason, issue or bit of evidence produced in the hearing. *McCann v. OLCC, supra.*

■ Plaintiffs raise only the sufficiency of the order when tested against the requirement it contain adequate findings of fact and conclusions of law. They do not raise the sufficiency of the evidence to support the findings or conclusions. We have determined the order is sufficient. The judgment of the circuit court is affirmed.

Affirmed.