Argued and submitted January 3, 1992; resubmitted In Banc October 14, reversed and remanded with instructions November 12, 1992, Pacific NW Bell's reconsideration and Citizens' Utility Board's reconsideration denied April 14, both petitions for review pending 1993

PACIFIC NORTHWEST BELL
TELEPHONE COMPANY,
dba U S West Communications,
*Respondent,*

*v.*

Myron B. KATZ,
Ron Eachus, Nancy Ryles
and Oregon Public Utility Commission,
*Appellants,*

*and*

CITIZENS' UTILITY BOARD,
*Intervenor-Appellant.*

(89C-12081; CA A66307)

841 P2d 652

Keith L. Kutler, Assistant Attorney General, Salem, argued the cause for appellants. On the briefs were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Robert M. Atkinson, Assistant Attorney General, Salem.

J. Rion Bourgeois, Portland, argued the cause and filed the briefs for intervenor-appellant.

John R. Faust, Jr., Portland, argued the cause for respondent. With him on the brief were Schwabe, Williamson & Wyatt and Charles L. Best, Portland.

RIGGS, J.

Warren, J., dissenting.

## RIGGS, J.

The Public Utility Commission (PUC)[1] appeals from a judgment of the circuit court reversing its Order 89-1355, which ordered Pacific Northwest Bell Telephone Company (PNB) to refund $10,056,772 to its customers. The circuit court found that the revenues to be refunded were generated from permanent, lawful rates and concluded, therefore, that the refund order constituted unlawful retroactive ratemaking. Citizens' Utility Board (CUB) appears as an intervenor. We reverse.

■ Although the appeal is from a judgment of the circuit court, we review PUC's order. ORS 756.598. We may not substitute our judgment for that of PUC on any finding of fact supported by substantial evidence. ORS 756.598. Whether or not we agree with PUC's inferences or reasoning, we will uphold PUC's order if it discloses a rational relationship between the facts and the legal conclusion reached. The order, however, must contain sufficient findings and conclusions to enable us to determine that the reasoning is rational and that PUC acted within its grant of power. *American Can v. Lobdell*, 55 Or App 451, 638 P2d 1152, *rev den* 293 Or 190 (1982); *Publisher's Paper Co. v. Davis*, 28 Or App 189, 559 P2d 891 (1977); *Pacific N.W. Bell v. Sabin*, 21 Or App 200, 214, 534 P2d 984, *rev den* (1975).

In December, 1985, PNB filed a revised rate schedule that increased its total revenue requirement and redistributed the recovery of the total revenue among various services. The rates of some individual services were increased, some were decreased and some were not changed. In response, PUC issued Order 85-1211, granting an interim increase in PNB's total revenue, subject to refund if PUC later determined that the increase was inappropriate. The interim rate schedule took effect on January 1, 1986.

After investigation, PUC determined that, instead of a total revenue increase, a revenue decrease should have been ordered. On March 31, 1987, PUC issued Order 87-406, ordering PNB to refund excess revenues collected under the

---

[1] Defendants Katz, Eachus and Ryles were the members of PUC at the relevant time.

interim rate schedule[2] and requiring it to reduce its total revenues by $45 million, to an amount below the 1985 authorized revenue level. PUC proposed an interim rate spread to achieve the reduction. The interim rate spread included a proposal to make Extended Area Service (EAS) optional. Optional EAS was intended to reduce revenues by $5.04 million.

During May and June, 1987, in accordance with PUC's proposed rate spread, PNB filed compliance tariffs, including optional EAS. Although PUC accepted most of the proposed tariffs, it rejected the optional EAS proposal, because it had decided to make a more thorough study of EAS services in connection with another case on its docket, UT-53. The final decision on EAS services would be made in that case. In the meantime, because it expected to reach a final decision within a relatively short period of time, PUC allowed PNB to continue providing mandatory EAS and to operate temporarily under an interim rate schedule that was $5.04 million per year higher than the authorized revenue level.

In May, 1988, CUB petitioned PUC to take action to stop overcollections and to refund amounts already over-collected. PUC issued Order 88-1523, in which PNB was ordered to reduce basic local service rates by $5 million per year. However, PUC denied a refund, because it concluded that ORS 759.185(4)[3] allows a refund only when an interim increase is involved and this situation did not involve an interim increase.

In April, 1989, PUC issued Order 89-461, by which it granted reconsideration of its decision in Order 88-1523 and ordered a refund of the overcollected revenues. It concluded

---

[2] In determining the amount to be refunded, PUC concluded that "rate or schedule of rates" in ORS 759.185(4) means the net revenue impact of PNB's interim rate schedule and not the excess earnings resulting from the increased rates of individual services. Therefore, it found that the refund should be $10,306,074 rather than $24,389,719. The amount is not at issue in this appeal.

[3] Statutes relating to regulation of all utilities, including telephone companies, were contained in ORS chapter 757 until July 1, 1989. Or Laws 1987, ch 447. Statutes relating to regulation of telephone companies are now contained in ORS chapter 759. The reorganization did not substantively change anything related to this case. Although most of the events in this case occurred before the change, we will refer to the statutes in chapter 759. ORS 759.185(4) is substantively identical to ORS 757.215(4).

that, although an interim increase was not involved, PNB had been unjustly enriched by the overcollections and, therefore, was not entitled to keep the excess revenues. Shortly thereafter, Order 89-461 was rescinded for procedural errors. However, PUC notified PNB that it would consider the issue on its own motion and that PNB should consider the rescinded order as a proposed order.

On October 13, 1989, PUC issued Order 89-1355, in which it ordered PNB to refund the overcollected revenues. It concluded that mandatory EAS was a partial continuation of the interim rate increase and that, therefore, the overcollected revenues were subject to refund under ORS 759.185(4). PNB brought this action to vacate the order under ORS 756.580. The circuit court reversed Order 89-1355 and vacated PUC's findings and conclusions. It made special findings that the revenues were generated from permanent rates authorized by PUC and that the EAS rates in effect were permanent rates authorized by PUC.[4]

The first issue is whether the refund was authorized under ORS 759.185(4). PUC contends that that statute gives it specific authority to order a refund, because the interim rate increase authorized by Order 85-1211 was partially continued when PUC rejected the proposed optional EAS rate. When a utility files a rate or schedule of rates that increases an existing rate or schedule of rates, PUC may, and in some cases must, conduct a hearing to determine its propriety and reasonableness. ORS 759.180(1). If PUC allows the proposed rate or schedule of rates to become effective on an interim basis while it conducts a hearing, ORS 759.185(4) provides, in pertinent part, that "any increased revenue *collected by the telecommunications utility as a result of such rate or rate schedule becoming effective* shall be received subject to being refunded." (Emphasis supplied.)

---

[4] The court stated in its letter opinion that its decision was

"predicated upon the factual assertion of [PNB] that the tariff filed by [PNB] and approved by [PUC] was in full force and effect and thus does not permit the action attempted by [PUC] in this case. If I am in error on the accuracy of the factual situation referred to above, then this decision would be erroneous and [PUC] would be entitled to either a refund or the assessment of an interest penalty."

PUC found:

"When the Commission rejected PNB's optional EAS tariffs it effectively revised Order 87-406 to order a partial rate reduction rather than the full rate reduction ordered by Commissioner Davis. In so doing, it effectively continued the interim rate increase authorized [in Order 85-1211]."

We cannot substitute our judgment for that of PUC on any finding supported by substantial evidence. ORS 756.598.

The evidence in the record does not support PUC's finding. Effective January 1, 1986, Order 85-1211 granted an interim rate increase from the permanent rates that were in effect through the end of 1985. Order 87-406 required PNB to reduce, rather than increase, its total revenues. The reduction took the form of a rate spread that terminated the interim increase authorized by Order 85-1211 and reduced PNB's rates below the 1985 level. The rate spread ordered in Order 87-406 showed these reductions (in millions of dollars):

| 1 | Rollback to 1985 rates | $19.24 |
|---|---|---|
| 2 | Business rate restructure | $ 9.61 |
| 3 | Touch-Tone rate reductions | $ 5.90 |
| 4 | Measured usage rate reductions | $ 0.40 |
| 5 | Optional EAS | $ 5.04 |
| 6 | Service Connection Charges | $ 5.32 |
| | Total | $45.51 |

It is apparent from the rate spread that the rate reduction anticipated by allowing optional EAS was a reduction *in addition to* the deletion of the 1986 interim rate increase. There is no evidence that the interim rate increase authorized by Order 85-1211 had made any changes in EAS charges. In fact, the evidence provided by the rate spread table indicates that mandatory EAS was already included in the 1985 rate schedule and that the change to optional EAS was a change from the 1985 rate schedule. The only evidence is that the rate reduction in Order 87-406 included a rollback to 1985 rates, which resulted in rescission of the interim rate increase of Order 85-1211, as well as additional reductions from the 1985 rate. Rescission of a rate increase cannot be a continuation of it. Because ORS 759.185(4) only requires PNB to refund revenues collected under an interim rate schedule that increases rates, and the interim rate increase

was rescinded by Order 87-406, the refund is not authorized by ORS 759.185(4).

■■ However, that is not the only authority by which PUC may order a refund. ORS 756.040 states, in pertinent part:

"(1) In addition to the powers and duties now or hereafter transferred to or vested in the commission, the commission shall represent the customers of any public utility, telecommunications utility, railroad, air carrier or motor carrier and the public generally in all controversies respecting rates, valuations, service and all matters of which the commission has jurisdiction. In respect thereof the commission shall make use of the jurisdiction and powers of the office to protect such customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates.

"(2) The commission is vested with power and jurisdiction to supervise and regulate every public utility, telecommunications utility, railroad, air carrier and motor carrier in this state, and to do all things necessary and convenient in the exercise of such power and jurisdiction."

Utility regulation, including ratemaking, is a legislative function, and the legislature has granted broad power to PUC to perform its delegated function.[5] *American Can v. Lobdell,* *supra,* 55 Or App 451; *Pacific N.W. Bell v. Sabin,* 21 Or App 200, 213, 534 P2d 984, *rev den* (1975). It is well settled that an agency has such implied powers as are necessary to enable the

_____

[5] The dissent inappropriately compares and equates the general grant of authority given to the agency regulating the milk industry with that given to PUC. Unlike that agency, PUC has been granted more than the power to "supervise and regulate." It has been granted the power to represent the customers of PNB in all controversies respecting rates, valuations, service and all other matters under its jurisdiction and, in doing so, the legislature has directed that PUC shall use its powers "to protect those customers, and the public generally, from unjust and unreasonable *exactions and practices and to obtain for them adequate service at fair* and reasonable rates." ORS 756.040(1). PUC has been granted the power to investigate utilities and to make whatever orders it deems justified or required by the results of its investigations. ORS 756.515. Thus, as we have said before, PUC has been granted "the broadest authority—commensurate with that of the legislature itself—for the exercise of [its] regulatory function." *Pacific N.W. Bell v. Sabin,* *supra,* 21 Or App at 214. Furthermore, the legislature has directed us to construe the provisions of the utility regulation laws liberally with a view toward the public welfare, efficient facilities and substantial justice. ORS 756.062(2). Of course, PUC's exercise of its authority is limited by the boundaries of the legislature's delegation, but the dissent fails to consider the breadth of that delegation.

agency to carry out the powers expressly granted to it. *See SAIF v. Wright,* 312 Or 132, 137, 817 P2d 1317 (1991); *Ochoco Const. v. DLCD,* 295 Or 422, 426, 667 P2d 499 (1983); *Warren v. Marion County et al,* 222 Or 307, 320, 353 P2d 257 (1960). However,

> "[T]he powers of a regulatory agency or agent are not * * * without limits. Like the legislature itself, a regulatory agency is bound to exercise its authority within the confines of both the state and federal constitutions. An agency's authority may be further limited by the legislature itself; its power arises from and cannot go beyond that expressly conferred upon it." 21 Or App at 213.

■■ PNB argues that, because the legislature has authorized refunds under a specific statute, ORS 759.185(4), it has limited PUC's authority to order a refund in any other circumstance. Nothing in ORS 759.185(4) or (5) limits PUC's power to order a refund in other circumstances, and we do not believe that the statute should be interpreted to impose such a limitation.[6] To hold that PUC does not have the power to order a refund of amounts over collected under temporary rates that failed to comply with an ordered revenue reduction would be inconsistent with its regulatory role and statutory duties. Such a holding would deprive PUC of much of its power to protect customers from abusive delay tactics or, as in this case, unexpectedly long delays in implementing an ordered revenue reduction. PNB is not entitled to retain excess revenues collected under an interim rate schedule that was not in compliance with the authorized revenue level, and PUC did not err in ordering PNB to refund those revenues.

The dissent asserts that our analysis fails to give effect to every provision of the relevant statutes. Holding that PUC *may* order refunds under other circumstances does not render superfluous ORS 759.185(4) or (5), which *require* refunds under those *particular* circumstances. Those subsections limit PUC's discretion in ordering a refund under those circumstances, but that does not *necessarily* mean that PUC

---

[6] The dissent asserts that we have made an erroneous statement of law in concluding that ORS 759.185(4) and (5) should not be interpreted to impose a limitation on PUC's power to order refunds in other circumstances. Principles of statutory construction are not rules of law, but merely guides in determining legislative intent. *Gold v. Secretary of State,* 106 Or App 573, 809 P2d 1334 (1991). They must be harmonized with other rules of construction.

may not order refunds in other circumstances. The entire statutory scheme must be considered. It is the dissent's view that fails to give effect to other provisions in the statutory scheme. For example, ORS 759.200 allows PUC, in addition to powers otherwise vested in PUC, to order deferral of refunds of revenues that may arise under 10 different accounts. Although the statute does not expressly authorize refunds, the legislature must have contemplated that PUC could order refunds under circumstances other than those required under the particular circumstances in ORS 759.185(4) and (5).

■ ■   PNB's argument that a refund would constitute retroactive ratemaking is not well taken. Retroactive ratemaking occurs when past profits or losses are incorporated in setting future rates.[7] This case does not concern comparing *authorized* revenues with *actual* revenues and then adjusting for unexpected profits or shortfalls. PUC is not ordering PNB to refund past *profits*. Rather, PUC is ordering PNB to refund amounts that were overcollected under an interim rate schedule that was not in compliance with the authorized revenue level.

Intervenor CUB's assignments of error related to the interest portion of the refund and to the award of attorneys fees under ORS 759.900 do not merit discussion.

Reversed and remanded with instructions to reinstate PUC Order 89-1355.

**WARREN, J.,** dissenting.

The dispositive issue in this case is whether PUC has the authority to order the refund. The majority correctly determines that PUC lacks express statutory authority to do

---

[7] The United States Supreme Court has said that

"The just compensation safeguarded to .the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service. And rates not sufficient to yield that return are confiscatory. * * * Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory. * * * Profits of the past cannot be used to sustain confiscatory rates for the future." *Board of Commissioners v. New York Telephone Co.*, 271 US 23, 31, 46 S Ct 363, 366, 70 L Ed 808 (1926).

Although no Oregon courts have addressed the issue of retroactive ratemaking, the issue was examined extensively in an Oregon Attorney General Letter of Advice (Op-6076, March 18, 1987). Because this case does not involve retroactive ratemaking, we need not decide the extent of the rule's application in Oregon.

so under ORS 759.185(4) but concludes that authority must be implied under ORS 756.040. 116 Or App at 310. Although I agree with the majority that "an agency has such implied powers *as are necessary to enable the agency to carry out the* powers expressly granted to it," the majority fails to recognize that we cannot imply a power under a general grant of authority that exceeds the scope of a specific grant of authority. Because the majority does just that, I dissent.

In *Sunshine Dairy v. Peterson et al.*, 183 Or 305, 193 P2d 543 (1948), the court examined the relationship between general and specific grants of authority. In that case, the plaintiff challenged the authority of the Director of Agriculture to establish a minimum price differential between milk products sold in single serving containers and those sold in larger containers. The defendant claimed that the action was authorized by OCLA § 34-1003, which provided that the defendant had the authority

"(c) to supervise and regulate the milk industry of the state, including production, * * * transportation, manufacture, storage, distribution and sale of milk; * * * (g) to adopt and enforce all rules, regulations and/or orders necessary to carry out the provisions of this act; (h) to exercise such other powers as hereinafter are specified."

The court rejected the defendant's contention. It concluded that the determination of whether the general grant of authority authorized the minimum price differential was a question of legislative intent that required consideration of the statute as a whole. One of the other statutes concerning the defendant's authority provided, in part:

"The board shall ascertain what prices for milk in each locality and market area of the state will best protect the milk industry and insure a sufficient quantity of pure and wholesome milk in the public interest. The board shall take into consideration all conditions affecting the milk industry, including the price necessary to produce a reasonable return to the producer and to the milk dealer.

"After making such investigation the board shall, by order, fix the minimum wholesale and retail prices to be charged for milk handled and sold within the state for human consumption in fluid form, and including the following classes:

"(a) By producers or associations of producers to milk dealers; (b) by milk dealers to stores for consumption on the premises, or for resale to consumers or to others; (c) by stores to consumers or to others except for consumption on the premises where sold; (d) by producer-distributor and distributor for deliveries to homes of consumers; provided, that based upon differences in cost of said various services, if any, the board, upon facts found by it, may establish differentials in prices between house-to-house sales by dealers, house-to-house deliveries by stores, and sales on credit and the over-the-counter sales by stores for cash." OCLA § 34-1012.

Because that statute specifically addressed the defendant's authority to fix prices, the court concluded that the legislature did not intend the general grant of authority to confer any power to fix prices beyond that conferred by the specific grant. 183 Or at 321. It viewed the specific provision

" 'not as an impairment or qualification of the general powers of the board, but as an amplification and extension thereof, and we are of the opinion that the authority to fix prices is to be found only in that article.' " 183 Or at 320, quoting *Supplee-Wills-Jones Milk Co. v. Duryee*, 116 NJ Law 75, 181 A 908 (1935).

In short, the specific provisions of a regulatory scheme can confer powers beyond those conferred by a general provision. Conversely, the general provisions of a regulatory scheme do not impliedly confer powers that exceed the powers inherent in a specific provision.

" 'It is a well established principle of statutory construction that when a specific power is granted by a statute and the limits of such power are therein marked out, the section granting the power and not general provisions in other sections of the statute must be looked to in ascertaining the effect and extent thereof.' " 183 Or at 338, quoting *Lucerne Cream and Butter Company v. Milk Commission of Virginia*, 182 Va 490, 129 SE2d 397 (1944).

Similarly, in *Safeway Stores v. State Bd. Agriculture*, 198 Or 43, 255 P2d 564 (1953), the court considered whether a general grant of authority authorizing the defendant to "supervise and regulate the milk industry" determined the extent of the defendant's licensing authority or, rather, if that power was limited by more specific provisions of the regulatory scheme. After acknowledging that that was a

question of legislative intent, the court reiterated the rule that

> "definite provisions in a statute relating to the subject under consideration control general provisions, in the absence of language which requires a contrary holding." 198 Or at 69.

The court then concluded that the specific grants of authority controlled over the general grant, because

> "[t]he very fact that each of [the specific] provisions is cast in exact terms would render the situation anomalous if the legislature intended that other phases of licensing should be governed by a grant of power as lacking in definiteness as the provision 'to supervise and regulate the milk industry.' " 198 Or at 72.

Although *Sunshine Dairy* and *Safeway* are older cases, both of which involved the same agency, the rules applied in them remain valid and are applicable, regardless of which agency's authority is challenged. For example, in *Ochoco Const. v. DLCD*, 295 Or 422, 667 P2d 499 (1983), the court considered whether the Department of Land Conservation and Development had the authority to challenge local land use decisions made after a comprehensive plan acknowledgment. Because the department did not have the express authority to do that, it argued that it had implicit authority:

> "[T]he Department argues that an examination of its general statutory authority, considered in light of the purpose of ORS chapter 197, compels a construction which grants it the authority it claims. Specifically, the Department relies on ORS 197.045(4) which grants power to the [department] to '[p]erform other functions required to carry out ORS 197.005 to 197.430 and 469.350.' " 295 Or at 434.

The court disagreed. After examining the statutory scheme as a whole, it concluded that

> "such responsibility is conspicuously absent in light of the breadth of responsibility with which the Department expressly is charged during the planning stage. Furthermore, none of the responsibilities expressly delegated to the Department are in any way frustrated by its inability to challenge land use decisions made after comprehensive plan acknowledgment." 295 Or at 434.

The court further noted that, subsequent to the date that the case arose, the legislature amended one of the specific statutes governing the department's authority. That amendment allowed the department to review and act upon some local land use decisions after plan acknowledgment by issuing a compliance order. The court concluded that that

"specific grant of power to the Department * * * further supports our conclusion that the 1979 Legislature did *not* intend impliedly to grant the power claimed here to challenge individual land use decisions before LUBA." 295 Or at 435 n 14.

Because a specific grant of authority specified when the department could do the challenged act, the department was not impliedly authorized to do that act other than under the specific circumstances.

ORS 756.040(1) provides:

"In addition to the powers and duties now or hereafter transferred to or vested in the commission, the commission shall represent the customers of any public utility, telecommunications utility, railroad, air carrier or motor carrier, and the public generally in all controversies respecting rates, valuations, service and all matters of which the commission has jurisdiction. In respect thereof the commission shall make use of the jurisdiction and powers of the office to protect such customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates."

The majority contends that that statute impliedly authorizes PUC to order a refund, even though it does not have the specific authority to under ORS 759.185(4)[1] or any of the other statutes governing refunds.[2] Because that conclusion

---

[1] Although ORS 759.185(4) is written in terms of when a utility must refund revenues, PUC is the only agency that can compel compliance with that directive. Consequently, as the majority recognizes, the statute provides PUC the authority to order refunds under the stated circumstances. If that were not true, the majority would not have had to analyze whether the refund PUC ordered was authorized by that statute.

[2] Although I agree with the majority that ORS 759.200(2) also authorizes the PUC to order refunds, those refunds are specifically limited to increases in revenues or decreases in expenses directly associated with one of the events specified in ORS 759.200(2)(a) through (j). None of those events is involved here. Consequently, that statute does not authorize PUC to order the refund that it ordered.

conflicts with the rule that a specific grant of authority limits the authority that can be implied under a general grant, I dissent.[3]

Richardson and Edmonds, JJ., join in this dissent.

---

[3] In *Union Pac. R. R. Co. v. Bean*, 167 Or 535, 119 P2d 575 (1941), the court held that PUC could not suspend proposed *reduced rates* filed by railroad carriers, because the statute authorizing PUC to suspend rates specified the PUC could suspend a proposed *rate increase*. At that time, PUC's general grant of authority was as broad as it is today. *See* OCLA § 112-105. Although the court did not specifically base its opinion on the rule that a specific grant of authority controls over a general, the decision does indicate that PUC's power is not as plenary as the majority contends.