Argued and submitted July 23, 2012, affirmed April 17, 2013

WAH CHANG,
*Petitioner,*

*v.*

PUBLIC UTILITY COMMISSION OF OREGON;
and PacifiCorp, dba Pacific Power,
*Respondents.*

Public Utility Commission of Oregon
UM1002; A143692

301 P3d 934

Thomas W. Sondag argued the cause for petitioner. With him on the briefs was Lane Powell PC.

Michael Casper, Deputy Solicitor General, argued the cause for respondent Public Utility Commission of Oregon. On the brief were John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Judy C. Lucas, Senior Assistant Attorney General.

David J. Burman, Seattle, argued the cause for respondent PacifiCorp. On the brief were Lawrence H. Reichman and Perkins Coie LLP; Roy Pulvers and Hinshaw & Culbertson, LLP; and Natalie Hocken.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Petitioner Wah Chang entered into a special contract with PacifiCorp whereby PacifiCorp agreed to supply Wah Chang with electricity at rates different from its standard industrial tariff. For the first three years of the five-year contract, Wah Chang was to receive a rate that was substantially lower than PacifiCorp's standard industrial rate; for the remaining two years, Wah Chang was to be charged a rate tied to the Dow Jones California/Oregon Border (DOW COB) index, a market index that purported to reflect the average price for "day ahead" wholesale power transactions at the Oregon-California border. The PUC approved the agreement, and the special tariff went into effect in September 1997.

By the end of the third year of the tariff, when the rates shifted to variable pricing based on the Dow COB index, the electricity market was in the throes of the so-called "Western Energy Crisis of 2000-01." The prevailing dysfunction in the western energy market had a dramatic effect on the Dow COB index, and Wah Chang's electricity rates skyrocketed correspondingly. Wah Chang then petitioned the PUC to exercise its authority to determine that Dow-COB-index pricing under the special contract resulted in unjust and unreasonable rates, and to order that PacifiCorp provide service at its standard industrial rates instead. The PUC denied the petition, and Wah Chang now seeks judicial review of that decision. ORS 756.610(1) (allowing judicial review of PUC orders as orders in contested cases in accordance with ORS 183.480 to 183.497). For the reasons that follow, we affirm the decision of the PUC.

The relevant background facts are undisputed, unless otherwise noted. Wah Chang is a large industrial manufacturer located in Millersburg, Oregon. The company's second-highest operating cost is electricity, and it has always purchased its electricity from PacifiCorp, which services the territory where Wah Chang is located. Until 1997, Wah Chang was purchasing electricity from PacifiCorp at the same rate as PacifiCorp's other industrial customers, under PacifiCorp's standard industrial tariff, "Schedule 48T."

In the mid-1990s, as part of an effort to reduce its power costs, Wah Chang explored the possibility of obtaining power from a source other than PacifiCorp. At Wah Chang's urging, the Millersburg City Council commissioned a feasibility study to evaluate the economics of forming a municipal utility. That study showed that the City of Millersburg could establish an electricity distribution system that would allow Wah Chang to purchase electricity on the open market for less than what it was paying under PacifiCorp's standard industrial tariff. After that study, PacifiCorp and Wah Chang entered into the Master Electric Service Agreement (MESA) pursuant to ORS 757.230, a statute that allows the PUC to authorize special rate schedules for individual customers who have a "service alternative."

The MESA covered a five-year period. For the first three years of the contract, Wah Chang was to pay a fixed price based on PacifiCorp's estimated production costs, plus an "adder" of $11 per megawatt hour (MWh) for transmission, distribution, and other services, and to contribute to PacifiCorp's profits. However, PacifiCorp was unwilling to predict its costs beyond three years, so, for the final two years of the contract, the parties agreed to use a variable index rate rather than a fixed cost. The parties chose the Dow COB index, a market index published by *The Wall Street Journal* that reflects the daily average of power prices at the California-Oregon border, to which they then added $11 per MWh.

On September 9, 1997, the PUC reviewed and accepted the provisions of the MESA, approving a special tariff that incorporated its terms. The MESA rates became effective three days later.

For the first three years under the special tariff—when the rates were based on a fixed price—Wah Chang's payments were approximately $6 million less than they would have been under Schedule 48T. Things changed significantly, however, once the tariff rates shifted to pricing based on the Dow COB index on September 12, 2000. By that time, California and neighboring states were in the midst of an energy crisis. Among other contributing factors,

California had restructured its electricity market and promulgated regulations that were subject to manipulation by market participants—including, notoriously, Enron. Consequently, the Dow COB index, which is heavily influenced by wholesale bulk power transactions in California, had skyrocketed and, along with it, so did the special tariff rates. In a single month, Wah Chang paid nearly $5.8 million for electricity that, under Schedule 48T, would have cost less than $500,000. In a single year, Wah Chang saw a 600-percent increase in electricity costs, from $4.5 million to nearly $31.5 million.

On December 1, 2000, Wah Chang petitioned the PUC for relief from the special tariff rates.[1] Wah Chang asked the PUC to declare that the rates tied to the Dow COB index were unjust and unreasonable, and to substitute PacifiCorp's standard industrial tariff, Schedule 48T, for the remainder of the MESA's term. The PUC denied that petition, on the ground that the parties had negotiated the special tariff rates at arms' length and Wah Chang had assumed the risk of price increases over the last two years of the MESA. Wah Chang petitioned for judicial review by the Marion County Circuit Court.[2]

While that petition for judicial review was pending, Wah Chang filed a motion with the Marion County Circuit Court requesting permission to present new evidence to the PUC. Specifically, Wah Chang sought permission to present evidence that had surfaced about Enron's participation in market manipulation, as well as evidence that PacifiCorp, doing business as Pacific Power, had filed complaints with the Federal Energy Regulatory Commission (FERC) seeking relief from its own power purchase contracts. In those FERC complaints, Pacific Power alleged—like Wah Chang before the PUC—that market dysfunction had caused those contract rates to be unjust and unreasonable.

---

[1] Wah Chang simultaneously filed an action in Linn County Circuit Court seeking, among other relief, a declaration that further performance under the MESA was excused. That case is not part of this appeal.

[2] Under *former* ORS 756.580 (2003), *repealed by* Or Laws 2005, ch 638, § 21, challenges to PUC orders were commenced by filing a complaint in Marion County Circuit Court. In 2005, the legislature changed the method of judicial review so that PUC orders now are reviewed as orders in contested cases subject to the provisions of ORS 183.480 to 183.497. ORS 756.610.

In June 2002, the Marion County Circuit Court granted Wah Chang's motion to present additional evidence, concluding that the evidence was material and not available at the time of the PUC's initial decision. The court remanded the case to the PUC to reopen the record for Wah Chang to present its additional evidence, unless the PUC determined on remand that the evidence would not change its decision under any foreseeable circumstances.

On remand, the PUC concluded that it was at least conceivable that additional evidence regarding the manipulation of the wholesale power market might change its view of Wah Chang's petition. The PUC explained that "it is theoretically possible that the California wholesale electricity market became dysfunctional because of PacifiCorp's manipulation, deceit, illegal conduct, and fraud in that market." But rather than consider the question at that time, the PUC elected to wait until after FERC completed its investigation, and it invited Wah Chang to file a motion to reopen the record once that federal investigation was complete.

The following year, FERC investigative staff issued a report on price manipulation in western markets. That report recommended that 38 utilities and marketers, including PacifiCorp, be required to show cause why they should not be found in violation of their tariffs and required to return related profits. Subsequently, the PUC's staff issued a report recommending that the PUC not pursue misconduct or mismanagement cases against PacifiCorp. The PUC staff concluded that PacifiCorp had only limited involvement in the specious buy/sell transactions, which had occurred over a five-month period beginning in July 2000. PUC staff determined that the transactions represented less than one percent of PacifiCorp's wholesale power purchases or sales for 2000, and that PacifiCorp voluntarily terminated them in mid-November 2000 when it became increasingly aware that the deals involved a single point of delivery.

In January 2004, Wah Chang filed a motion asking the PUC to reopen this proceeding, which the PUC granted. After Wah Chang and PacifiCorp further supplemented the evidentiary record and their arguments, the PUC again

denied Wah Chang's request for relief from the indexed-based rates, over a dissent by one of the commissioners.

In its final order, the PUC explained that the "primary question presented by Wah Chang's complaint" was whether "the Commission [should] exercise its ratemaking authority to revise Wah Chang's rates under the special tariff." That question, the PUC concluded, turned on the interplay between two statutes, ORS 756.040 and ORS 757.230. The former statute states the general requirement that the PUC is to protect utility customers, and the public generally, "from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates." ORS 756.040(1). The latter statute, ORS 757.230, sets out factors that the PUC, "at a minimum," must consider when "the commission determines that a tariff filing * * * results in a rate classification primarily related to price competition or a service alternative[.]" Those factors include "[w]hether the rate generates revenues at least sufficient to cover relevant short and long run costs of the utility during the term of the rates" and "[w]hether the rate generates revenues sufficient to insure that just and reasonable rates are established for remaining customers of the utility * * *." ORS 757.230(1)(a), (b).

The PUC reasoned that, considering those two statutes together, Wah Chang is "entitled to rates that are fair and reasonable" but that "rates that are fair and reasonable for a unique customer like Wah Chang are not necessarily the same as rates that are fair and reasonable for other customers." The PUC explained:

> "We arrive at that conclusion by again noting that ORS 756.040 requires us to set rates that provide a utility adequate revenue to cover reasonable expenses and afford a reasonable return on investment. But when we read ORS 756.040 along with ORS 757.230, we recognize that the fair and reasonable standard for Wah Chang is different. The standard is different because for the first three years of the special tariff Wah Chang paid rates designed to give PacifiCorp a *lesser* return on investment than what ORS 756.040 requires of other customers. And for the final two years of the special tariff, the fair and reasonable standard is again different because Wah Chang, unlike

other customers, paid rates that were connected to the Dow COB Index, rather than to the cost of service.

"* * * * *

"Our duty to set fair and reasonable rates in all rate cases under ORS 756.040 must involve rate spread considerations under ORS 757.230, so if we adjust rates for one customer class, we do not cause rates for other customer classes to become unjust and unreasonable. We therefore conclude that the fair and reasonable rate for Wah Chang under ORS 756.040 requires the application of ORS 757.230, and the consideration of how any modification to the rates Wah Chang negotiated with PacifiCorp would impact remaining customers."

(Footnotes omitted; emphasis in original.)

The PUC further observed that ratemaking is "a zero sum game." That is, if Wah Chang's rates were to be reduced, it would come out of the pockets of PacifiCorp's share-holders or the utility's remaining customers. Of the three—Wah Chang, PacifiCorp's shareholders, and PacifiCorp's remaining customers—the PUC concluded that only Wah Chang and PacifiCorp's shareholders should be in a position to bear the risk of rising energy costs, considering that the remaining customers had no say in the special tariff. And, as between Wah Chang and PacifiCorp, the PUC concluded that Wah Chang had assumed the risk of rising energy costs under the MESA, and that market dysfunction alone was not enough to entitle Wah Chang to relief. Rather, the PUC ruled, "Wah Chang may recover from PacifiCorp [by] show[ing] conduct amounting to bad faith on the part of the utility, so only the utility's shareholders are exposed to the costs of any revision we make in the special tariff."

The PUC then considered whether PacifiCorp had, in fact, acted in bad faith. The PUC reasoned that PacifiCorp's questionable trading activities were limited in scope, volun-tarily terminated, and not directed at the COB market. Thus, the PUC found that "PacifiCorp did not act in bad faith" and, further, that "Wah Chang has failed to demonstrate that PacifiCorp's trading activity materially impacted the Dow COB Index price."

After concluding that PacifiCorp had not acted in bad faith, the PUC then offered an "alternative ground" that "mandates [the] dismissal of Wah Chang's complaint under a different analysis than the one we have presented above." Under that separate "economic analysis," the PUC concluded that "prevailing wholesale market rates reflect the minimum level of rates allowed under ORS 757.230(1)," and that "[a]ny lower rate would fail to generate sufficient revenues to fully cover PacifiCorp's relevant costs to serve Wah Chang." Based on that, and other findings, the PUC concluded that "the Dow COB Index remains an appropriate measure for determining the commodity rate to be paid by Wah Chang for the remaining 21 months of the MESA."

One commissioner dissented. He concluded that the majority's decision erroneously held Wah Chang to its bargain, and that the reasonableness of rates cannot be set by private contract ("Simply put, there is no such thing as a 'deal is a deal' when it comes to utility regulation."); that ORS 757.230 "does not apply in this case, much less abrogate Wah Chang's right to a just and reasonable rate"; and that nothing in Oregon law requires Wah Chang to prove that PacifiCorp acted in "bad faith" as a prerequisite to obtaining just and reasonable rates.

On judicial review in this court, Wah Chang echoes many of the points made by the dissenting commissioner, arguing that the PUC's decision to deny relief from the MESA rates derived from an erroneous interpretation of ORS 757.230, and was then compounded by a "bad faith" standard that finds no support in the law. As we will explain, we disagree with Wah Chang's (and the dissenting commissioner's) characterization of the PUC's decision. We conclude that the PUC understood and correctly applied the relevant statutes, that it acted within its discretion to require "bad faith" by PacifiCorp as part of its analysis of Wah Chang's petition for relief, and that none of Wah Chang's other arguments is well taken.

We begin with Wah Chang's most fundamental disagreement with the PUC decision: the majority's reliance on ORS 757.230. That statute, according to Wah Chang, concerns the initial decision to authorize a special rate for

an individual customer and applies "only when [that] special contract rate is established, not when an established rate is challenged as unreasonable." Moreover, Wah Chang submits, the statute only establishes criteria for deciding whether a proposed contract rate *is* too *low* to approve, not whether it has become unreasonably *high*. So, by applying ORS 757.230 to a subsequent challenge that established rates are too high—and, in fact, treating that statute as an exception to the general "unjust and unreasonable" standard in ORS 756.040—the PUC "renounced" its duty to protect Wah Chang from "unjust and unreasonable exactions and practices," ORS 756.040(1).

In response, the PUC and PacifiCorp take issue with Wah Chang's reading of the majority's decision, and with Wah Chang's interpretation of ORS 757.230. In their view, the PUC did not abrogate its duty to protect Wah Chang from unjust and unreasonable rates. Rather, it applied ORS 757.230 *and* ORS 756.040 to determine whether, under all the circumstances, Wah Chang's rates remained just and reasonable; in other words, it harmonized the two statutes rather than treating ORS 757.230 as an exception that permits unjust and unreasonable rates for special tariff customers. And, they contend, the PUC was permitted to do so, because nothing in ORS 757.230 limits the considerations in that statute to the initial tariff approval.

The parties' arguments, so framed, require us to answer two related questions. First, we must determine what the PUC actually decided with regard to the meaning and application of ORS 757.230—that is, which of the competing characterizations of the ruling is correct. Only then, after determining what the PUC actually decided, can we assess the second question: whether the PUC erred in that understanding or application of the law.

With regard to the initial question—what the PUC decided—we reject Wah Chang's argument that the PUC renounced its duty under ORS 756.040 to protect Wah Chang from unjust and unreasonable rates. Throughout the majority opinion, the PUC presumes that all customers, including those under special tariffs, are entitled to fair and reasonable rates under the general directive of ORS 756.040.

Moreover, the order expressly states that "[t]he fact that we find that ORS 757.230 controls our review of Wah Chang's request to revise the special tariff does not mean that we are ignoring ORS 756.040. Wah Chang is still entitled to rates that are fair and reasonable *under that statute*." (Emphasis added.) However, because of the unique considerations in play under ORS 757.230, the PUC concluded that the "rates that are fair and reasonable for a unique customer like Wah Chang are not necessarily the same as rates that are fair and reasonable for other customers." Read as a whole, the PUC's order does not apply an exception to ORS 756.040, but instead develops and applies a standard by which to gauge whether the rates of the special tariff were unjust or unreasonable under the particular circumstances of the case.[3]

Because we agree with the PUC's characterization of its reasoning, we likewise agree with the PUC and PacifiCorp that the order is entitled to more deference than Wah Chang proposes. The PUC's process of determining a formula for evaluating whether rates have become unjust or unreasonable is the consummate delegative task, and the PUC "is not obligated to employ any single formula or combination of formulas to determine what are in each case 'just and reasonable rates.'" *Gearhart v. PUC*, 255 Or App 58, 63, 299 P3d 533 (2013) (quoting *Pacific N. W. Bell v. Sabin*,

---

[3] We acknowledge that there are passing statements in the majority's lengthy opinion that suggest otherwise. Two footnotes, in particular, give us pause. In footnote 50, the PUC states that the "dissent fails to acknowledge that [*American Can Co. v. Davis*, 28 Or App 207, 559 P2d 898, *rev den*, 278 Or 393 (1977),] was decided prior to the passage of ORS 757.230, which, by its terms, *creates an exception to the just and reasonable rate standard for special tariff customers*." (Emphasis added.) In footnote 52, the majority states that "[t]he dissent attempts to minimize the role of ORS 757.230, concluding that the required considerations set forth in sections (1)(a) and (b) merely inform the just and reasonable standard set forth in ORS 756.040. *The dissent fails to recognize that the legislature's more specific intent expressed in ORS 757.230 with regard to special tariffs controls over the more general requirements expressed in ORS 756.040*. ORS 174.020(2); *Bobo v. Kulongoski*, 338 Or 111, 119, 107 P3d 18 (2005)." (Emphasis added.) In light of the rest of the PUC's order, which consistently describes ORS 757.230 in the context of determining just and reasonable rates, we discount the significance of the footnotes. In context, we understand the footnotes to be imprecise efforts to communicate the majority's primary criticism of the dissenting commissioner's opinion: that, because of the specific context in which special tariff rates are established, the "unjust and unreasonable" inquiry is different for those customers, and the dissenting opinion understates the importance of that contextual difference.

21 Or App 200, 214, 534 P2d 984, *rev den* (1975)); *id.* ("[T]he factors involved in ratemaking are 'so many and so variable that it is impossible to fix rates that will be mathematically correct or exactly applicable to all the new conditions that may arise even in the immediate future.'" (Quoting *Hammond Lbr. Co. v. Public Service Com.*, 96 Or 595, 609, 189 P 639 (1920)); *see also Springfield Education Assn v. School Dist.*, 290 Or 217, 230, 621 P2d 547 (1980) (citing ORS 756.040(1) as an example of "delegative" statutory language; explaining that the legislature "could set utility rates from time to time by statute, but it does not," and that "the agencies are empowered to regulate and, in so doing, to make delegated policy choices of a legislative nature within the broadly stated legislative policy"). In other words, so long as the factors in ORS 757.230(1) were permissible considerations in determining "just and reasonable" rates, we will not second-guess the PUC's use of those factors in combination with, or to the exclusion of, other factors.[4]

That said, the PUC does not have discretion to mis-interpret or misapply the law. We will not affirm the PUC's decision that Wah Chang's rates remained "just and reason-able" if we conclude that the formula employed by the PUC was based on an erroneous interpretation of ORS 757.230(1), or was specifically precluded by some source of law. *See* ORS 183.482(8)(a), (b); *Citizens' Utility Board. v. PUC*, 154 Or App 702, 716-17, 962 P2d 744 (1998), *rev dismissed*, 335 Or 91 (2002) (reversing and remanding PUC decision because "[t]he general grants of authority in ORS 756.040 and other general statutes do not empower PGE to charge or PUC to approve rates of a kind that are specifically contrary to the limitations in ORS 757.355 and ORS 757.140(2)").

As described above, Wah Chang offers various rea-sons why it was error for the PUC to reject its petition for relief based on the criteria in ORS 757.230(1)(a) and (b). For one, Wah Chang argues that ORS 757.230 is triggered only by a tariff filing and does not apply to a subsequent

---

[4] Wah Chang suggests that a 2001 amendment to ORS 756.040, Or Laws 2001, ch 569, § 1, converted the terms "unjust and unreasonable" into inexact rather than delegative terms. We are not persuaded that the amendment, even if applicable to these circumstances, had that effect.

challenge to the reasonableness of the special tariff rates. The statute provides, in relevant part:

"The Public Utility Commission shall provide for a comprehensive classification of service for each public utility, and such classification may take into account the quantity used, the time when used, the purpose for which used, the existence of price competition or a service alternative, the services being provided, the conditions of service and any other reasonable consideration. Based on such considerations the commission may authorize classifications or schedules of rates applicable to individual customers or groups of customers. The service classifications and schedule forms shall be designed consistently with the requirements of ORS 469.010. Each public utility is required to conform its schedules of rates to such classification. *If the commission determines that a tariff filing under ORS 757.205 results in a rate classification primarily related to price competition or a service alternative, the commission, at a minimum, shall consider the following*:

"(a) *Whether the rate generates revenues at least sufficient to cover relevant short and long run costs of the utility during the term of the rates*;

"(b) *Whether the rate generates revenues sufficient to insure that just and reasonable rates are established for remaining customers of the utility*[.]"

ORS 757.230(1) (emphasis added).

Wah Chang points to the last sentence of ORS 757.230 to argue that the "trigger" for the PUC to consider factors (a) and (b) is a "tariff filing under ORS 757.205." That cross-referenced statute, in turn, imposes an obligation on "[e]very public utility" to file

"within a time to be fixed by the commission, schedules which shall be open to public inspection, showing all rates, tolls and charges which it has established and which are in force at the time for any service performed by it within the state, or for any service in connection therewith or performed by any public utility controlled or operated by it."

ORS 757.205(1). "[T]he only such filing with respect to the MESA," Wah Chang submits, "occurred in 1997"; thus, its later request for relief from the scheduled rates did not

trigger ORS 757.230 but is instead governed by the general protections in ORS 756.040 against unjust and unreasonable rates.

In light of the PUC's broad discretion to determine the formula for ratemaking, Wah Chang's challenge is not well taken. Whether or not ORS 757.230 is directly triggered in this circumstance, there is nothing in the statute that precludes the PUC from exercising its discretion to consider the same statutory factors in a subsequent complaint challenging the reasonableness of the established tariff rates.[5] In other words, even if the PUC "shall" consider the statute as part of an initial tariff filing, the PUC may also decide to consider the statute as context when later evaluating the reasonableness of those established rates. The PUC explained in its order,

> "[I]n determining whether to modify a previously approved special tariff, the Commission must consider these same legislative considerations to ensure that any rate change does not result in the harm that ORS 757.230 was intended to prevent. * * * [N]othing in the text of ORS 757.230 restricts its application to just the initial approval of the special tariff."

We agree with that view of the statute and PUC's ratemaking authority. In the absence of some statutory prohibition that precludes the PUC from relying on the considerations in ORS 757.230, we will not limit the PUC's otherwise broad authority to determine a formula for ratemaking. *See Pacific Northwest Bell Telephone Co. v. Katz*, 116 Or App 302, 310, 841 P2d 652 (1992), *rev den*, 316 Or 528 (1993) (rejecting the utility's argument "that, because the legislature has authorized refunds under a specific statute, ORS 759.185(4), it has limited PUC's authority to order a refund in any other circumstance. Nothing in ORS 759.185(4) or (5) limits PUC's power to order a refund in other circumstances, and we do not believe that the statute should be interpreted to impose such a limitation."); *Cascade Natural Gas Corp. v. Davis*, 28 Or App 621, 630, 560 P2d 301, *rev den*, 279 Or 1 (1977) ("ORS 757.105 represents an extension of the

---

[5] In other words, as PacifiCorp contends, "even if ORS 757.230 did not apply by its terms, the Commission had discretion to apply the same considerations, among others, in deciding Wah Chang's claim."

Commissioner's authority and not a limitation on his power to exclude a particular expense from the rate base in determining what would be a just and reasonable rate. Thus, the Commissioner's authority to disallow cost items from a rate base stems not from ORS 757.105, but from the power to set just and reasonable rates."); *Sabin*, 21 Or App at 224-25 ("So long as disallowances of this nature neither violate any specific statutory limits upon the Commissioner's otherwise plenary ratemaking power nor result in the imposition of rates which produce a taking of private property without just compensation, they will be upheld as both reasonable and lawful.").

Wah Chang alternatively argues that, even if it was permissible for the PUC to look to ORS 757.230(1), the PUC misapplied the statute, because the statutory criteria were intended to protect remaining utility customers by establishing a floor beneath which rates cannot fall; thus, the criteria are entirely inapposite in determining whether rates have become excessively *high*. Wah Chang argues:

> "It is pointless to utilize criteria intended to ensure that a rate is not too low to decide whether a rate is too high: deciding that a contract rate covers a utility's costs and provides reasonable rates for other customers does not ensure that the rate is fair and reasonable—it would be unusual if an unreasonably high contract rate did *not* meet those criteria."

(Emphasis in original.) The PUC and PacifiCorp, meanwhile, argue that the PUC acted within its discretion to ensure, under ORS 757.230(1), that any modification of special tariff rates would not impose costs on PacifiCorp's remaining customers.

Wah Chang is correct that ORS 757.230(1)(a) and (b) protect remaining customers by ensuring that special tariff rates do not become too low. Both paragraphs of the statute are phrased in terms of the sufficiency of the revenue generated for the utility, with an eye toward how the special tariff will affect remaining customers. It does not follow, however, that the PUC misinterpreted ORS 757.230 or that the statute was irrelevant to the question before the PUC—

*i.e.*, whether PacifiCorp's special tariff rates, *under all the circumstances*, were "unjust and unreasonable" under ORS 756.040.

In assessing whether the special tariff rates had become "unjust and unreasonable," the PUC was not required to ignore the context in which those special tariff rates were negotiated and approved, particularly the fact that Wah Chang received the benefit of special rates that remaining customers did not. The PUC explained that, "for the first three years of the special tariff Wah Chang paid rates designed to give PacifiCorp a *lesser* return on investment than what ORS 756.040 requires of other customers." (Emphasis in original.) Moreover, the benefit initially was approved with the understanding that it would not impose an unjust burden on remaining customers. That is, the PUC approved the special tariff because the rates, although lower than those of other customers, were *at least sufficient* to ensure that the other customers paid just and reasonable rates as well. A mid-contract adjustment to the special tariff rates, however, would at least call into question whether that was still the case, especially in light of the fact that Wah Chang had already paid a lower rate than other customers for three years of the MESA; thus, the PUC concluded that its "duty to set fair and reasonable rates in all rate cases under ORS 756.040 must involve rate spread considerations under ORS 757.230, so if we adjust rates for one customer class, we do not cause rates for other customer classes to become unjust and unreasonable." In sum, it was well within the PUC's discretion, under the particular circumstances before it, to conclude that "756.040 requires the application of ORS 757.230, and the consideration of how any modification to the rates Wah Chang negotiated with PacifiCorp would impact remaining customers."

The PUC elected to remove remaining customers from the calculus entirely, in an effort to "ensure those customers cannot be harmed by a tariff they had no say in developing." The PUC expressed its reluctance to "turn ORS 757.230 on its head, for it is clear that any special tariff we set under that statute (or, in this case, are asked to reset for the benefit of Wah Chang) must protect—not harm—

remaining customers." That, too, was a proper exercise of agency discretion in determining whether Wah Chang's rates were unjust and unreasonable. Again, the PUC was not required to ignore, as part of its inquiry, the fact that Wah Chang, not the remaining customers, assumed certain contractual risks under the MESA. On judicial review, we will not disturb the PUC's discretionary decision as to how to account for that fact, or its balancing of the interests of Wah Chang, PacifiCorp, and other customers in setting fair and reasonable rates.

For related reasons, we reject Wah Chang's challenge to the "bad faith" standard imposed by the PUC. With other customers removed from the calculus, the PUC concluded that, as between PacifiCorp's shareholders and Wah Chang, it was Wah Chang that had "assumed the risk of the wholesale market prices for the final two years of its special tariff." Thus, the PUC explained that it would hold Wah Chang to those special tariff rates unless Wah Chang could show (1) that PacifiCorp acted in bad faith; and (2) that the actions of PacifiCorp were material in affecting the price under the Dow COB index. In that event, the PUC reasoned, "only the utility's shareholders are exposed to the costs of any revision we make in the special tariff." In effect, the PUC adopted a presumption similar, but not identical, to the one employed by FERC under the Federal Power Act: that electricity rates in freely negotiated wholesale-energy contracts are "just and reasonable" until proven otherwise. *See Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County*, 554 US 527, 530, 128 S Ct 2733, 171 L Ed 2d 607 (2008) ("Under the *Mobile–Sierra* doctrine, the Federal Energy Regulatory Commission * * * must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law.").

On review, Wah Chang argues that the PUC was unjustified in adopting the "bad faith" standard. Suffice it to say that the PUC's standard was reasonably tailored to the issues presented by Wah Chang's petition for relief and was a permissible exercise of the PUC's discretion in crafting a standard to determine whether the MESA rates had become unreasonable or unjust. For that reason, and the others

stated above, we reject Wah Chang's first assignment of error.[6]

In its second assignment of error, Wah Chang alternatively argues that the PUC "erred in failing to give Wah Chang an opportunity to present evidence and arguments responsive to its interpretation of ORS 757.230." However, in June 2008, the ALJ issued an order that stated:

> "The original contract was approved pursuant to the statute, which provides that the Commission, in approving a tariff filing primarily related to price competition or a service alternative, at a minimum, shall consider:
>
> "(a) Whether the rate generates revenues at least sufficient to cover relevant short and long run costs of the utility during the term of the rates; and
>
> "(b) Whether the rate generates revenues sufficient to insure that just and reasonable rates are established for remaining customers of the utility.
>
> "Pacific Power is requested to address how the Commission should apply that statutory standard in the context of its review of Wah Chang's petition in December, 2000, *i.e.*, whether granting the petition and returning Wah Chang to standard tariff rates would meet these statutory standards.
>
> "Pacific Power shall make its supplemental filings not later than July 31, 2008. *Wah Chang also may address the application of ORS 757.230 at that time.*"

(Emphasis added.) Wah Chang filed a memorandum in response to that order and explained, why "returning Wah Chang to standard rates as of October 2000 or December 2000 will comply with ORS 757.230(a) and (b)."

Wah Chang was on notice that the PUC was considering how to apply the criteria in ORS 757.230 in the context of Wah Chang's petition, and had an opportunity to

---

[6] Wah Chang's first assignment of error has other permutations, including that the decision went beyond the PUC's delegated discretion, discriminated against Wah Chang, and was an unexplained departure from prior agency practice. We have considered those arguments and, to the extent that we have not explicitly addressed them, reject them without discussion. Moreover, because we affirm the PUC's decision based on its "primary" analysis, we do not reach its alternative "economic analysis" for determining that Wah Chang's special tariff rates remained fair and reasonable.

address that issue. Wah Chang was not entitled, under the circumstances of this case, to more than that; that is, Wah Chang was not entitled to advance notice of the PUC's ultimate reasoning regarding the statute, and another opportunity to refute it. We reject Wah Chang's second assignment of error.

In its third assignment, Wah Chang argues that the PUC failed to consider its argument that PacifiCorp engaged in "unjust practices"—as distinguished from Wah Chang's argument that the special tariff rates were unjust and unreasonable. Wah Chang's "unjust practices" contentions focused on PacifiCorp's participation in manipulative energy-trading schemes. According to Wah Chang, the PUC "should be instructed to consider whether, aside from the MESA's unreasonable rates, Wah Chang is entitled to relief because of PacifiCorp's unjust practices."

Although the PUC's order does not separately analyze Wah Chang's "unjust practices" contentions, the majority implicitly considered and rejected those arguments. In describing the parties' respective positions, the order states that "Wah Chang cites the Commission's duty under ORS 756.040 to protect utility customers against '*unjust and unreasonable exactions and practices* and to obtain for them adequate services at fair and reasonable rates.'" (Emphasis added.) The order later recites, in detail, Wah Chang's assertions about PacifiCorp's involvement in market manipulation through, among other things, phony transactions. The PUC majority simply was not persuaded that there was anything "unjust and unreasonable" about PacifiCorp's practices, when considered in the context of the parties' relationship. The PUC explained:

> "At the end of this proceeding, we are left with the same basic facts—the extent of PacifiCorp's questionable trading activities are largely related to a small number of intermediary buy/sell transactions largely directed at the Cal-ISO market, not the COB market, that were entered into during a limited period of time and that were voluntarily terminated."

Later, the PUC explained that "the trading activity addressed by Wah Chang is unlikely to have had any effect on the Dow COB Index, but instead the Cal-ISO. Even if we had

concluded that PacifiCorp engaged in unlawful activities during the Western Energy Crisis, we would not grant Wah Chang relief without a showing that the unlawful activities adversely affected the Dow COB Index price."

The PUC's order, like Wah Chang's own petition,[7] treated the question of "unjust practices" as part of the larger question whether Wah Chang should be granted relief under ORS 756.040. The PUC did not ignore Wah Chang's argument and evidence regarding PacifiCorp's practices; rather, it was not persuaded by Wah Chang's position and implicitly said as much when it denied the petition for relief. We therefore reject Wah Chang's third assignment of error.

In its final assignment of error, Wah Chang argues that, to the extent that the PUC actually considered PacifiCorp's conduct, "the PUC erred in relying on assertions in materials from other proceedings"—namely, investigative reports and filings by FERC and PUC staff—rather than evidence in the record. Wah Chang concedes that the PUC was authorized by administrative rule to take, and did take, "official notice" of "administrative rulings and reports of the Commission and other governmental agencies," *former* OAR 860-014-0050(1) (11/18/99).[8] However, it argues that "the PUC went beyond simply noticing that those materials existed, and erroneously assumed the truth of their contents. *See, e.g.,* [*Arlington Ed. Assn. v. Arlington Sch. Dist. No. 3*, 177 Or App 658, 666, 34 P3d 1197 (2001), *rev den*, 333 Or 399 (2002).]"

Wah Chang's argument—including its reliance on *Arlington Ed. Assn.*—erroneously equates "official notice"

---

[7] Wah Chang's petition for relief states that it is filed under "the Commission's power under ORS 756.040(1) to protect petitioner from an unjust and unreasonable exactions and practices," and then proceeds to allege that "[t]he Dow COB index has become an unjust and unreasonable pricing mechanism." The petition ultimately requests

"that the Commission enter an order (a) determining that Dow COB index pricing under the Master Electric Service Agreement results in unjust and unreasonable rates and (b) ordering that respondent serve petitioner's Millersburg plant at Schedule 48T rates effective September 12, 2000, or effective the earliest date permitted by law, and (c) ordering such other and further relief as is just and proper under the circumstances."

[8] The relevant administrative rules have since been readopted with different numbers. We refer to the versions in effect at the time that the PUC took official notice of the reports in its 2009 decision.

with "judicial notice." The PUC's administrative rules contemplate that the commission can take official notice of, and thereby consider even if not offered at the contested case hearing, "administrative rulings and reports of the Commission and other governmental agencies," *former* OAR 860-014-0050(1)(b) (11/18/99), as well as "[o]rders of the Commission," *former* OAR 860-014-0050(1)(c) (11/18/99), and "[d]ocuments and records in the files of the Commission which have been made a part of the file in the regular course of performing the Commission's duties," *former* OAR 860-014-0050(1)(d) (11/18/99). Those subjects of official notice are separate from, and in addition to, the PUC's ability to take official notice of "[a]ll matters of which the courts of the State of Oregon take judicial notice[.]" *Former* OAR 860-014-0050(1)(a) (11/18/99). Furthermore, under *former* OAR 860-014-0045(1)(b) (11/18/99), the PUC is entitled to rely on evidence that is "of a type commonly relied upon by reasonably prudent persons in the conduct of their serious affairs," which can include hearsay statements in official reports, *see Reguero v. Teacher Standards and Practices*, 312 Or 402, 417, 822 P2d 1171 (1991) (hearsay evidence is not categorically so unreliable that it cannot be substantial). In light of the relevant administrative rules, we are not persuaded that the PUC erred by taking official notice of, and relying on, the contents of the reports of its own staff and FERC.

*Arlington Ed. Assn.* is not to the contrary. In that case, we considered whether the Employment Relations Board (ERB) was authorized to take official notice of a letter from the school district that, although not submitted at the evidentiary hearing on a district employee's grievance, had appeared elsewhere in ERB's files. The school district argued that the letter could not be considered by ERB because it was not part of the hearing record and "taking official notice of the letter falls outside the range of discretion delegated to ERB under ORS 183.450(4)." 177 Or App at 663. That statute provides that "[t]he hearing officer and agency may take notice of *judicially cognizable facts*, and may take official notice of general, technical or scientific facts within the specialized knowledge of the hearing officer or agency." ORS 183.450(4) (emphasis added). The question before us was

whether the letter could be considered a "judicially cognizable fact" within the meaning of the statute. 177 Or App at 663. We explained that the term was not defined by statute but that a provision of the Oregon Evidence Code, OEC 201(b), defines the similar term "judicially noticed fact" to include, as relevant, those facts "[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Id.* (quoting OEC 201(b)). We then considered, as a matter of statutory construction, whether "a private document submitted by a party into an agency record can constitute a source 'whose accuracy cannot reasonably be questioned,'" and concluded that it was not. *Id.* at 664. Thus, we held that ERB had exceeded its statutory authority by taking official notice of the letter. *Id.* at 669.

Here, by contrast, the issue is not whether the PUC took official notice of "judicially cognizable facts" under ORS 183.450(4) from a source "whose accuracy cannot reasonably be questioned." In fact, ORS 183.450(4) does not apply to the PUC at all. *See* ORS 183.315(6) ("ORS 183.410, 183.415, 183.417, 183.425, 183.440, 183.450, 183.460, 183.470 and 183.482(3) do not apply to the Public Utility Commission."). Rather, as described above, the PUC has its own rules governing official notice, which are different from and much broader than "judicially cognizable facts" under the Oregon Evidence Code.[9] For that reason, Wah Chang's reliance on concepts related to "judicial notice" are not persuasive with regard to whether the PUC erred in taking official notice of investigative reports and filings by FERC and by the PUC's staff. We therefore reject Wah Chang's fourth and final assignment of error, and affirm the decision of the PUC.

Affirmed.

---

[9] The Official Commentary to the OEC 202 (law judicially noticed) indicates that the "Legislative Assembly rejected the proposal that it extend judicial notice in blanket fashion to the 'records' of courts," explaining that "[a]ny evidence concerning court records that can properly be noticed will be noticed as a verifiable fact under Rule 201(b). Many of the statements within court records are excludable as hearsay." The PUC's rules, in contrast, take a broader approach to "records" and "reports of the Commission and other governmental agencies," *former* OAR 860-014-0050(1)(b), (e) (11/18/99), and unquestionably extend "official notice" beyond those facts whose accuracy cannot be questioned. For instance, the PUC can take official notice of "[t]he results of the Commission's or ALJ's own inspection of the physical conditions involved after notice to the parties." *Former* OAR 860-014-0050(1)(g) (11/18/99).