ARMSTRONG, P. J.
*145 Petitioner Calpine Energy Solutions LLC is an electricity service supplier that provides direct-access electricity to customers who opt out of purchasing electricity from utilities regulated by the Public Utility Commission of Oregon (PUC), including PacifiCorp dba Pacific Power (PacifiCorp). As part of the regulatory regime under which direct-access customers are allowed to opt out of purchasing electricity from PacifiCorp, direct-access customers are required to pay an "opt-out charge" to PacifiCorp to allow PacifiCorp to prevent the shifting of costs of investments to customers who do not opt out. In this case, petitioner seeks judicial review of PUC Docket UE 296, Order No. 15-394, that approved PacifiCorp's opt-out charge.
On review, petitioner contends that (1) the PUC's approval of the opt-out charge is based on an implausible construction of the applicable statutes; (2) the PUC's order lacks sufficient findings, and, even if the findings are sufficient, the PUC's order is not supported by substantial evidence or substantial reason; and (3) the PUC improperly concluded that prior PUC orders precluded consideration of petitioner's arguments.[1] As explained below, we conclude that the PUC's ultimate finding in PUC Order 15-394 that PacifiCorp's opt-out charge calculation is reasonable lacks substantial evidence. Accordingly, we reverse and remand.
We first summarize the regulatory landscape, as applicable to this case, to provide context for the PUC order on review. Under ORS 756.040(1), the PUC is directed to "balance the interests of the utility investor and the consumer in establishing fair and reasonable rates" charged by public utilities.[2]
*310 See also ORS 757.210(1)(a) ("The commission *146 may not authorize a rate or schedule of rates that is not fair, just and reasonable.").[3] When the PUC sets utility rates, "it is performing a quasi-legislative function." Gearhart v. PUC , 356 Or. 216, 221, 339 P.3d 904 (2014). "[R]atemaking is a unique enterprise that is governed by statute but largely left to the PUC's discretion." Id. In calculating rates, "there is no single correct sum, but rather a range of reasonable rates." Id. at 220, 339 P.3d 904. "However, the PUC does not have discretion to misinterpret or misapply the law, and we will not affirm if the formula used by the PUC was based on an erroneous interpretation of the law, or was specifically precluded by some source of law." Utility Reform Project v. PUC , 277 Or. App. 325, 341, 372 P.3d 517 (2016).
This case specifically concerns the rates the PUC approved as part of PacifiCorp's direct-access program. See generally ORS 757.600 - 757.691 (direct access regulation). Direct access, as defined by statute, "means the ability of a retail electricity consumer to purchase electricity and certain ancillary services, as determined by the commission for an electric company or the governing body of a *147 consumer-owned utility, directly from an entity other than the distribution utility." ORS 757.600(6). That means eligible electricity customers served by PacifiCorp can "opt out" of purchasing electricity from PacifiCorp and can, instead, purchase electricity directly from a certified electricity service supplier, using PacifiCorp's distribution system. See ORS 757.601(1) ("All retail electricity consumers of an electric company, other than residential electricity consumers, shall be allowed direct access beginning on March 1, 2002."); ORS 757.632 ("Every electricity service supplier is authorized to use the distribution facilities of an electric company on a nondiscriminatory basis after the retail electricity consumers of the electricity service supplier are afforded direct access pursuant to ORS 757.601.").
Because direct-access programs allow eligible customers to opt out of purchasing electricity from electric companies such as PacifiCorp, those programs can cause the shifting of costs to pay for investments made by the utility before the customer opted out to those customers that do not opt out. See PGE v. Duncan, Weinberg, Miller & Pembroke, P.C. , 162 Or. App. 265, 270, 986 P.2d 35 (1999) (discussing how "stranded costs" or "transition costs" occur when an electric utility transitions from a regulated monopoly to a competitive environment). To avoid that consequence, the legislature authorized the PUC to allow electric companies to include transition adjustments in direct-access program rates. Specifically, ORS 757.607(1) directs that the PUC "shall ensure" that "[t]he provision of direct access to some retail electricity consumers must not cause the unwarranted shifting of costs to other retail electricity consumers of the electric company." That statute further provides that
"direct access, portfolio or rate options and cost-of-service rates may include transition charges or transition credits that reasonably balance the interests of retail electricity consumers and utility investors. The commission may determine that full or partial recovery of the costs of uneconomic utility investments,[4 ] or full or partial *311 pass-through *148 of the benefits of economic utility investments[5 ] to retail electricity consumers, is in the public interest."
ORS 757.607(2) ; see also ORS 757.600(31) (" 'Transition charge' means a charge or fee that recovers all or a portion of an uneconomic utility investment."); ORS 757.600(32) (" 'Transition credit' means a credit that returns to consumers all or a portion of the benefits from an economic utility investment."). The PUC has adopted rules that require transition charges or credits "equal to 100 percent of the net value of the Oregon share of all economic utility investments and all uneconomic utility investments of the electric company as determined pursuant to *** an ongoing valuation." OAR 860-038-0160(1). An "ongoing valuation" means "the process of determining transition costs or benefits for a generation asset by comparing the value of the asset output at projected market prices for a defined period to an estimate of the revenue requirement of the asset for the same time period." OAR 860-038-0005(41). This proceeding involves the PUC's approval of PacifiCorp's calculation of transition charges using an ongoing valuation, and, more specifically, PacifiCorp's opt-out charge as a component of transition charges for its five-year opt-out program.
Before we turn to the order on review (PUC Order 15-394), we must first recount what occurred in a prior proceeding (PUC Docket UE 267) and the two orders that *149 resulted from that proceeding (PUC Order 15-060 and PUC Order 15-195). In 2012, the PUC directed PacifiCorp to "file a tariff for a 'five-year opt-out program that allows a qualified customer to go to direct access and pay fixed transition charges for the next five years, and then to be no longer subject to transition adjustments-for so long as that customer remains a direct access customer (on the [PacifiCorp] system).' " In re PacifiCorp Transition Adjustment, Five-year Cost of Service Opt-Out , PUC Docket No UE 267, Order No 15-060, 1 (Feb. 24, 2015) (PUC Order 15-060).[6]
In 2013, PacifiCorp filed its tariff, Schedule 296, with the PUC for its five-year opt-out program, which initiated PUC Docket UE 267 (UE 267). Petitioner intervened in that proceeding. After a hearing, the PUC staff and several intervenors, including petitioner, entered into a stipulation that resolved all the issues in UE 267. PacifiCorp did not agree to the stipulation and, instead, filed a modified version of Schedule 296. PUC Order 15-060 at 2.
As relevant to this proceeding, the stipulation and PacifiCorp's modification addressed the opt-out charge for direct-access customers in the five-year opt-out program as a component of the rate for the program. PacifiCorp and the stipulating parties agreed that, "during the five-year transition period, a direct access customer should be subject to delivery charges, generation fixed costs (calculated pursuant to Schedule 200[7] ), and a transition adjustment." Id. at 4. The parties *312 also agreed that, after the five-year period, a direct-access customer would pay PacifiCorp only for delivery service. However, the stipulating parties argued that PacifiCorp should not be allowed to charge those direct-access customers the additional opt-out charge. Id. at 4-5.
As proposed, PacifiCorp's opt-out charge was "intended to represent the fixed generation costs incurred by the company to serve all customers offset by the value of freed-up *150 power made available by the departing customers for years six through 20 after a customer's departure" to direct access. Id. at 4. In response to the stipulation, PacifiCorp modified its proposal for the opt-out charge to cover only years six through 10. Essentially, as provided through illustrative calculations by PacifiCorp,[8] the opt-out charge is calculated by PacifiCorp by taking the Schedule 200 fixed generation costs at the time of the customer's departure to direct-access electricity and increasing those costs at the rate of inflation to project the costs for years six through 10. Those costs are then reduced to a "net present value" that also takes into consideration an offset for the "value of freed-up power" from the customer's departure to determine the opt-out charge, which is then divided equally over the five-year opt-out period. PacifiCorp contended that the opt-out charge was "necessary to minimize cost shifting to nonparticipating customers" because, without the charge, "PacifiCorp estimates that, between years six and ten, the transition costs associated with 175 MW of departing direct access load approximate $ 58.9 million on a nominal basis, or $ 35.4 million on a net present value basis." Id . at 4-5.
The stipulating parties, including petitioner, argued that PacifiCorp should not be permitted to seek transition costs through the opt-out charge for years six through 10 from departing customers because PacifiCorp's evidence to support its calculation of stranded costs was inadequate as based on illustrative examples and not real data; PacifiCorp could adjust its system to match load loss within five years; the charge permits PacifiCorp to avoid its duty to mitigate transition costs; and "imposing ten years of alleged costs in a five-year period of recovery would present a negative value proposition for participants and ensure that the program would be doomed to fail." Id. at 5-6.
The PUC allowed PacifiCorp's modified opt-out charge in Schedule 296. The PUC reasoned, as follows:
"We conclude that the consumer opt-out charge is necessary pursuant to implementation of the state's direct access laws by our rules. The inclusion of an opt-out charge *151 is consistent with our request that PacifiCorp design a five-year opt-out program that would protect other customers from cost-shifting. We also find that, even with the opt-out charge, PacifiCorp will have an incentive to minimize transition costs, having reduced the period for recovery from 20 to 10 years.
"The Stipulating Parties failed to rebut PacifiCorp's evidence of transition costs, up to approximately $ 60 million, in years six to ten of the program, and rely too heavily on mere assertions about how transition costs beyond year five can be reduced or erased. Moreover, we reject the Stipulating Parties' arguments that PacifiCorp's system load growth will completely mitigate any transition costs. As PacifiCorp notes, GRID[9 ] considers forecasted system load growth in calculating both the transition adjustments and the consumer opt-out charge."
Id. at 6-7. After resolving other issues that are not relevant to this case, the PUC ordered PacifiCorp to file a revised tariff consistent with the order. Id. at 13.
Several parties, including petitioner, sought clarification or, alternatively, reconsideration of PUC Order 15-060. In re PacifiCorp Transition Adjustment, Five-year Cost of Service Opt-Out , PUC Docket No. UE 267, Order No. 15-195, 1 (June 16, 2015) (PUC
*313 Order 15-195). Those parties sought clarification of the opt-out charge, arguing that PacifiCorp's calculation of that charge is unclear "because PacifiCorp presented it in exhibits that were illustrative in nature," and, thus, requested "that [the PUC] clarify that approval of the consumer opt-out charge is without prejudice to further the development of the underlying rate calculation." Id. at 2. In the alternative, the parties sought reconsideration "on two issues integral to calculation of the consumer opt-out charge: 1) the treatment of load growth; and 2) the treatment of depreciation in the assumptions underlying the consumer opt-out charge." Id.
The PUC declined to clarify its order and considered the purpose of the docket to be complete because *152 PacifiCorp had filed a revised Schedule 296 for its five-year opt-out program as ordered, which the parties had not disputed. However, the PUC did state:
"As PacifiCorp notes, if in the future the joint parties believe they have new evidence or arguments demonstrating that the consumer opt-out charge is unjust or unreasonable, they may seek our review at that time. But we cannot clarify the legal effect that our resolution of this docket of a particular issue may have on issues in future dockets."
Id. at 2-3. The PUC also declined to reconsider its decision, stating that "[n]o new evidence or change in the law was presented, and we are not persuaded that there is an essential error of fact or law in [PUC] Order No. 15-060." Id. at 3. Petitioner did not seek judicial review of the PUC orders in UE 267.
After the PUC approved the five-year opt-out program in PUC Order 15-060, but before it denied reconsideration of that approval in PUC Order 15-195, PacifiCorp filed its TAM application in April 2015. That proceeding, which is in PUC Docket UE 296 (UE 296), resulted in the order at issue in this case, PUC Order 15-394. As explained in PUC Order 15-394,
"PacifiCorp's TAM is an annual filing with the objective to forecast the actual [net power costs[10] ] the company expects to incur during the test year (12 months ending December 2016) to account for changes in market conditions. It also identifies the proper amount for the transition adjustment for customers wishing to move to direct access service."
PUC Order 15-394 at 1 (footnote omitted). PacifiCorp did not submit a revision to Schedule 296 with its TAM application and did not address the opt-out charge in its direct testimony.
Petitioner intervened in UE 296 and objected to, among other things, how PacifiCorp calculated the opt-out charge for its five-year opt-out program. In doing so, petitioner provided new argument and new evidence that it had *153 not submitted in UE 267. Instead of objecting to the opt-out charge in total, as it had in UE 267, petitioner argued for a refinement in the calculation of that charge. As relevant here, petitioner argued that,
"[i]n calculating the Schedule 296 Consumer Opt-Out Charge, Schedule 200 costs should not be escalated in years six through 10 as proposed by PacifiCorp. Rather, Schedule 200 costs used in this calculation should decline each year from year six through year 10 to reflect the decline in [PacifiCorp's] return on generation rate base attributable to the departed customers' loads, due to the effects of increased accumulated depreciation."
(Underscoring by petitioner.)
In support of that argument, petitioner presented testimony from its expert witness, Kevin Higgins. As relevant on review, Higgins testified that a refinement was required to the opt-out charge to account for the accumulated depreciation of the fixed generation costs in Schedule 200. Higgins first testified that "Schedule 200 costs should not be escalated in Years 6 through 10; since incremental generation expenditures are not incurred on departed customers' behalves, it is not reasonable to assume increased Schedule 200 costs for departing customers beyond the projected Year 5 Schedule 200 price." Higgins *314 then testified that Schedule 200 costs should, in fact, decrease each year, in years six through 10, "to reflect the decline in [PacifiCorp's] return on generation rate base attributable to the departed customers' loads, due to the effects of increased accumulated depreciation and amortization." Higgins calculated that the "Schedule 200 entry should decline by approximately 2.36 [percent] per year from Years 6 through 10."[11]
In response to Higgins' testimony, PacifiCorp submitted written reply testimony from Brian Dickman. Dickman testified that the PUC had already rejected petitioner's argument in UE 267 and that petitioner had not *154 submitted any new argument or evidence for the PUC to consider. Dickman also answered the following question:
"Q. Is [PacifiCorp's] proposed Consumer Opt-Out Charge here consistent with the [PUC's] order in docket UE 267?
"A. Yes. In docket UE 267, the [PUC] approved the Consumer Opt-Out Charge 'as it was presented in modified form by PacifiCorp in reply testimony.' Like [PacifiCorp's] filing in docket UE 267, the proposed Consumer Opt-Out Charge here properly escalates [PacifiCorp's] fixed generation costs at the average rate of inflation-meaning that, in real terms, the fixed generation costs are held constant through year 10. This is a conservative assumption and one that is consistent with the [PUC's] order in docket UE 267."
(Footnote omitted; boldface in original.)
During cross-examination at the hearing, Dickman also testified that
"PacifiCorp was very clear about the calculation of the consumer opt-out charge in UE 267. We were clear that it was a conservative calculation, leaving the fixed costs of generation in Schedule 200 constant in real terms over 10 years, which there's many other factors besides depreciation expense and return of rate base that go into that Schedule 200.
"Other charges escalate over time, and that rate does not stay constant and typically does not decline over time. So PacifiCorp's proposal to keep it constant in real dollars and then use a stream of costs with inflation to come up with a present value of the consumer opt-out charge was a conservative assumption."
PacifiCorp offered no other evidence to support its calculation of the opt-out charge.
In October 2015, the PUC issued a preliminary order, PUC Order 15-353, approving PacifiCorp's TAM application. The PUC stated that it was only providing "a brief listing of the issues and our resolution" and that "[a]n order will be entered later describing more fully the parties' positions and the rationale for our decision." PUC Order 15-353 at 1. The totality of the PUC's explanation with regard to *155 petitioner's challenge to the opt-out charge was as follows: "[Petitioner] asks for changes related to direct access"; and, "PacifiCorp has justified the need for the modeling changes it proposes with evidence in the record that was not adequately rebutted by the parties. *** We decline to adopt the three changes requested by [petitioner]." Id. at 2.
In December 2015, the PUC issued its final order, PUC Order 15-394, approving PacifiCorp's TAM application. As relevant here, the PUC characterized the parties' positions as follows:
"Second, [petitioner] challenges the escalation of the Schedule 200 opt-out charge in PacifiCorp's five-year opt-out program. [Petitioner] explains that the opt-out charge should be limited to the generation investment incurred prior to the sixth year. [Petitioner] states that once that portfolio is frozen, the revenue the company earns will decline each year as a portion of those assets is depreciated and amortized. [Petitioner] asks that the Schedule 200 entry decline 2.36 percent per year from years 6 through 10.
*315 "PacifiCorp responds that the consumer opt-out charge properly escalates the company's fixed generation costs at the average rate of inflation-so the fixed generation costs are held constant through year 10. PacifiCorp states that the [PUC] has already denied [petitioner's] request to decrease the consumer opt-out charge in years 6 through 10 in docket UE 267, and that [petitioner] has not presented any new evidence or arguments."
PUC Order 15-394 at 11 (footnote omitted).
The PUC then explained its resolution of that issue:
"We reject all of [petitioner's] proposed changes. ***
"We have previously addressed the claim that the customer opt-out charge should be reduced to reflect a more accurate estimate of fixed generation costs. [Petitioner] has produced no new evidence or argument to persuade us to change our position. PacifiCorp explains that incremental generation is not added after year five. PacifiCorp also explains that, in real (inflation-adjusted) terms, the fixed generation costs are held constant through year 10. As we did in previous orders, we find it reasonable to assume that *156 fixed generation costs will increase at the rate of inflation after year five."
Id. at 12 (footnote omitted).
Petitioner seeks review of the PUC's approval of the opt-out charge in PUC Order 15-394. We review the PUC's order in the same way that we review other orders of administrative agencies in a contested case. ORS 756.610(1). As such, our review is "confined to the record," and we will "not substitute [our] judgment for that of the [PUC] as to any issue of fact or agency discretion." ORS 183.482(7). As relevant to petitioner's arguments, we review the PUC's order for legal error and whether the order is "supported by substantial evidence in the record." ORS 183.482(8)(a), (c). As part of our substantial evidence review, we also review the PUC's order for substantial reason.
On review, petitioner makes three arguments. Petitioner argues that, in approving the opt-out charge, (1) the PUC legally erred by applying an implausible construction of the applicable statutes; (2) the PUC order lacks sufficient findings for review, and, even if the findings are sufficient, the order is not supported by substantial evidence or substantial reason; and (3) the PUC improperly concluded that prior PUC orders precluded consideration of petitioner's arguments. We address each of those contentions in turn.
We start with petitioner's statutory argument. Petitioner argues that "the PUC's decision rests on an implicit conclusion that PacifiCorp may charge the participants in the five-year program for new investments in its generation plant made up to 10 years after that customer opted out of PacifiCorp's generation services." Petitioner argues that the PUC's decision necessarily allows PacifiCorp to include new generation investments made in years six through 10 in the opt-out charge because, otherwise, the charge would decrease in those years due to the effects of accumulated depreciation and reduced returns. Petitioner asserts that that legal conclusion is implausible in light of the plain meaning of the applicable statutes- ORS 757.607(2) (authorizing transition charges for "uneconomic utility investments") and ORS 757.600(35) (defining "uneconomic utility investments")-which allow only for transition charges for *157 generation investments made before , and not after, a direct-access customer opts out of PacifiCorp's generation service.[12] *316 We decline to address the merits of petitioner's argument. The PUC's order is based, in part, on the PUC finding that PacifiCorp was not adding new generation investments made in years six through 10 into its calculation of the opt-out charge. Specifically, in the order, the PUC accepted the explanation of PacifiCorp "that incremental generation is not added after year five" and "that, in real (inflation-adjusted) terms, the fixed generation costs are held constant through year 10." PUC Order 15-394 at 12. Because the legal issue raised by petitioner-whether the statutory definition of "uneconomic utility investment" permits new generation investments to be included in PacifiCorp's opt-out charge for years six through 10-is not put at issue by PUC Order 15-394, we do not address it.[13]
Petitioner next argues that the PUC's order is invalid because the PUC made inadequate findings to support its *158 summary conclusion that it is "reasonable to assume that fixed generation costs will increase at the rate of inflation after year five." PUC Order 15-394 at 12. Under ORS 756.558(2), the PUC is required to "prepare and enter findings of fact and conclusions of law upon the evidence received in the matter and shall make and enter the order of the commission thereon." We have explained that, with respect to that requirement, "[t]he recitation of finding must be sufficiently specific in order that the reviewing court does not have to delve into the record to discern the inferences the commissioner may have drawn in arriving at his conclusion." Publishers Paper Co. v. Davis , 28 Or. App. 189, 194, 559 P.2d 891 (1977) ; see also Utility Reform Project v. PUC , 215 Or. App. 360, 372, 170 P.3d 1074 (2007) (" 'The order, however, must contain sufficient findings and conclusions to enable us to determine that the reasoning is rational and that [the] PUC acted within its grant of power.' " (Quoting Pacific Northwest Bell Telephone Co. v. Katz , 116 Or. App. 302, 305, 841 P.2d 652 (1992), rev. den. , 316 Or. 528, 854 P.2d 940 (1993).)). In short, the findings in the PUC's order must be sufficient for purposes of our judicial review.
Here, petitioner argues that the PUC's findings are insufficient because the order does not address petitioner's unrebutted evidence that the effect of accumulated depreciation on a closed pool of fixed generation investments is a "significant decline" in revenue requirement from the opt-out charge in years six through 10. Thus, petitioner argues, the PUC's order "lacks any factual findings that could lead the court to conclude that it is reasonable to ignore depreciation of rate base for 10 years," and the order should be remanded for additional findings.
We disagree. The PUC order sets out two things PacifiCorp explained about the calculation of the opt-out charge: (1) "incremental generation is not added after year five"; and (2) "in real (inflation-adjusted) terms, the fixed generation costs are held constant through year 10." Based on those explanations-which the PUC accepted as accurate representations of how PacifiCorp calculated the opt-out charge-the PUC also found that it is "reasonable to assume that fixed generation costs will increase at the rate *159 of inflation after year five." The PUC also found that "[w]e have previously addressed the claim that the customer opt-out charge should be reduced to reflect a more accurate estimate of fixed generation costs," and petitioner's argument and evidence in this case did not persuade it to change its decision. *317 Those findings are sufficient for us to review the PUC's order because the order sets out the factual basis for the PUC's determination that the inclusion of the opt-out charge was fair and reasonable.
While, to be certain, it would have further assisted our judicial review if the PUC had made additional or more specific findings, the order is not insufficient such that it requires a remand for additional findings. Here, we are not left "to delve into the record to discern the inferences the [PUC] may have drawn in arriving at [its] conclusion." Publishers Paper Co. , 28 Or. App. at 194, 559 P.2d 891. The inferences on which the PUC based its order are clear from the face of the order.
Petitioner next asserts that PUC Order 15-394 must be remanded because it is not supported by substantial evidence or by substantial reason that connects the facts found to the ultimate conclusion. Because we agree that the order is not supported by substantial evidence, we do not address petitioner's substantial reason argument.
As set out above, we must "set aside or remand [the PUC's] order if [we] find[ ] that the order is not supported by substantial evidence in the record." ORS 183.482(8)(c). Substantial evidence supports the PUC's findings "when the record, viewed as a whole, would permit a reasonable person to make that finding." Id. Our review here is also informed by the standard that applied to the PUC hearing. PacifiCorp bore "the burden of showing that the rate or schedule of rates proposed to be established or increased or changed is fair, just and reasonable."[14] ORS 757.210(1)(a). Also, the PUC "may not authorize a rate or schedule of rates that is not fair, just and reasonable." Id.
*160 Petitioner asserts that PUC Order 15-394 is not supported by substantial evidence because "the record contains no calculation or explanation of how the elements of a pool of existing (as opposed to new or additional) investments in Schedule 200 will increase in cost at a level that negates the effect of accumulated depreciation."[15] Petitioner argues that PacifiCorp testified only that the "rate" in Schedule 200 does not decrease over time, a rate that would include new generation investments, and did not testify about the offset of accumulated depreciation on a closed-pool of assets. As a result, petitioner concludes, there is not a basis in record on which the PUC could conclude that it is "reasonable to assume that fixed generation costs will increase at the rate of inflation after year five."
The PUC responds that its order is supported by substantial evidence because "testimony from PacifiCorp's witnesses established that (1) the consumer opt-out charge includes fixed generation costs only; and (2) an inflation-adjusted opt-out charge is a conservative assumption because other factors and charges subsume any depreciation effect, causing the overall rate to increase over time." (Record citations omitted.) The PUC asserts that petitioner relies on conflicting evidence for its argument, not that there is no evidence to support the order, and a reasonable factfinder could conclude from that evidence that here the overall rate was fair and reasonable. Additionally, PacifiCorp responds that the PUC was not required to discuss every issue raised or evidence submitted by petitioner and asserts that the findings made by the PUC were supported by substantial evidence in the record, including PacifiCorp's witness testimony.
We conclude that the ultimate finding of the PUC, that it was "reasonable to assume that fixed generation costs will increase at the rate of inflation after year 5," is not *161 supported by substantial evidence in the *318 record. The only evidence pertaining to that finding came from PacifiCorp's witness, Dickman.[16] He testified that escalating the fixed generation costs at the rate of inflation was a "conservative assumption" and a "conservative calculation." He also testified that "there's many other factors besides depreciation expense and return of rate base that go into that Schedule 200[; o]ther charges escalate over time, and that rate does not stay constant and typically does not decline over time." Those statements, however, do not provide substantial evidence to support the PUC's finding that "it is reasonable to assume" that fixed generation costs will increase at the rate of inflation. The parties have pointed to nothing in the record, and we have found nothing, that provides any context to Dickman's bare assertions that the calculation is "conservative" or that "other costs" escalate over time. And those statements on their own are not supportive of the PUC's finding because those statements are not directed at the question whether it is reasonable to assume that fixed generation costs increase at the rate of inflation. In addition, there is no evidence in the record that new generation costs that do not include new generation investments increase over time, which is not the same as Dickman's testimony, which was that the Schedule 200 "rate," which does include new generation investments, "typically does not decline over time." In sum, there is no evidence in the record from which a "reasonable person" could find that it is "reasonable to assume" that fixed generation costs that do not include incremental generation investments, as found by the PUC, will escalate at the rate of inflation in years six through 10. See ORS 183.482(8)(c) ("Substantial evidence exists to support a finding when the record, viewed *162 as a whole, would permit a reasonable person to make that finding.").
Before we reverse and remand to the PUC based on that lack of substantial evidence, we address one final issue. The PUC in its order also based its determination on its "previous orders." Specifically, the PUC rejected petitioner's argument and evidence because it found that that argument and evidence did not persuade it to change the decision that it had made in its prior orders-viz. , that inclusion of PacifiCorp's opt-out charge results in a fair and reasonable rate. Given the PUC's order as a whole, and the state of the record, we are left with the conclusion that the PUC based its ultimate decision, at least in part, on those prior orders and not on the evidence in the record. As a result, we must consider whether it was appropriate for the PUC to do that. Petitioner argues that it was not, and, under the circumstances presented here, we agree.
First, as pointed out by petitioner, the PUC's orders in UE 267 did not actually resolve the issue raised by petitioner in this matter. In UE 267, the PUC order denied reconsideration to take up petitioner's depreciation argument because "[n]o new evidence or change in the law was presented, and we are not persuaded that there is an essential error of fact or law in Order No. 15-060." PUC Order 15-195 at 3; see also id. at 2 ("PacifiCorp notes that none of the joint parties challenged the calculation of the consumer opt-out charge, despite their opportunity to do so in testimony or during cross-examination."). The PUC also stated that, "if in the future the joint parties believe they have new evidence or arguments demonstrating that the consumer opt-out charge is unjust or unreasonable, they may seek our review at that time." Id. at 2-3. Thus, the PUC's statement in the order on review, PUC Order 15-394, that "[w]e have previously addressed the claim that the customer opt-out charge should be reduced to reflect a more accurate *319 estimate of fixed generation costs," is not supported by substantial evidence in the record.
Second, the PUC's and PacifiCorp's citation to ORS 183.482(8)(b)(B) does not provide a basis on which the PUC could simply rely on its prior orders as a substitute for *163 substantial evidence in the record.[17] ORS 183.482(8)(b)(B) provides that we must remand an agency order if the agency's exercise of discretion is "[i]nconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency." Nothing in that statutory section provides support for the notion that the PUC must maintain consistency with a prior order unless petitioner presented a persuasive reason to depart from the prior order.
The PUC has a duty to ensure that rates are fair, just, and reasonable, and PacifiCorp bore the burden to demonstrate that its proposed transition adjustment is fair, just, and reasonable. ORS 757.210(1)(a) ; see also ORS 756.040. In addition, the findings that the PUC makes to support its fair and reasonable determination must be based on the evidence in the record . See ORS 756.558(2) ("After the completion of the taking of evidence, and within a reasonable time, the commission shall prepare and enter findings of fact and conclusions of law upon the evidence received in the matter and shall make and enter the order of the commission thereon." (Emphasis added.)). That the PUC may need to explain any departure from established rule or policy does not affect the PUC's duties or PacifiCorp's burden. Nor does it diminish our duty to examine the PUC's findings for substantial evidence in the record and remand that order when it is lacking. See ORS 183.482(8)(c). Accordingly, we reverse and remand.
Reversed and remanded.

Oregon Business Coalition and Industrial Customers of Northwest Utilities filed amicus curiae briefs in support of petitioner's petition on review.

ORS 756.040(1) provides:
"In addition to the powers and duties now or hereafter transferred to or vested in the Public Utility Commission, the commission shall represent the customers of any public utility or telecommunications utility and the public generally in all controversies respecting rates, valuations, service and all matters of which the commission has jurisdiction. In respect thereof the commission shall make use of the jurisdiction and powers of the office to protect such customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates. The commission shall balance the interests of the utility investor and the consumer in establishing fair and reasonable rates. Rates are fair and reasonable for the purposes of this subsection if the rates provide adequate revenue both for operating expenses of the public utility or telecommunications utility and for capital costs of the utility, with a return to the equity holder that is:
"(a) Commensurate with the return on investments in other enterprises having corresponding risks; and
"(b) Sufficient to ensure confidence in the financial integrity of the utility, allowing the utility to maintain its credit and attract capital."

ORS 757.210(1)(a) provides:
"Whenever any public utility files with the Public Utility Commission any rate or schedule of rates stating or establishing a new rate or schedule of rates or increasing an existing rate or schedule of rates, the commission may, either upon written complaint or upon the commission's own initiative, after reasonable notice, conduct a hearing to determine whether the rate or schedule is fair, just and reasonable. The commission shall conduct the hearing upon written complaint filed by the utility, its customer or customers, or any other proper party within 60 days of the utility's filing; provided that no hearing need be held if the particular rate change is the result of an automatic adjustment clause. At the hearing the utility shall bear the burden of showing that the rate or schedule of rates proposed to be established or increased or changed is fair, just and reasonable. The commission may not authorize a rate or schedule of rates that is not fair, just and reasonable."

An "uneconomic utility investment" is defined as
"all electric company investments, including plants and equipment and contractual or other legal obligations, properly dedicated to generation, conservation and workforce commitments, that were prudent at the time the obligations were assumed but the full costs of which are no longer recoverable as a direct result of ORS 757.600 to 757.667, absent transition charges. 'Uneconomic utility investment' does not include costs or expenses disallowed by the commission in a prudence review or other proceeding, to the extent of such disallowance, and does not include fines or penalties as authorized by state or federal law."
ORS 757.600(35).

An "economic utility investment" is defined as
"all electric company investments, including plants and equipment and contractual or other legal obligations, properly dedicated to generation or conservation, that were prudent at the time the obligations were assumed but the full benefits of which are no longer available to consumers as a direct result of ORS 757.600 to 757.667, absent transition credits. 'Economic utility investment' does not include costs or expenses disallowed by the commission in a prudence review or other proceeding, to the extent of such disallowance, and does not include fines or penalties authorized and imposed under state or federal law."
ORS 757.600(10).

The PUC orders in UE 267 were not made a part of the record on review. However, we take judicial notice of those PUC orders as official acts of the PUC. See OEC 202(2) ; McGee Plumbing, Inc. v. Building Codes Div. , 221 Or. App. 123, 131, 188 P.3d 420 (2008) ("An agency decision is an official act within the scope of [OEC 202(2) ].").

Schedule 200 is PacifiCorp's tariff for fixed generation costs.

Petitioner included two of the illustrative calculations prepared by PacifiCorp for UE 267 in its exhibits for the proceeding on review.

"GRID stands for Generation and Regulation Initiative Decision Tool. GRID is PacifiCorp's hourly production cost model that the company has used in its Oregon rate filings since 2002." PUC Order 15-394 at 2 n. 2.

PacifiCorp defines net power costs as "the sum of fuel expenses, wholesale purchase power expenses and wheeling expenses, less wholesale sales revenue." Schedule 201 is PacifiCorp's tariff for net power costs.

Petitioner included with Higgins' testimony PacifiCorp's responses to data requests. In one of those responses, PacifiCorp stated that, for years six through 10, "the Schedule 200 costs are based on the Schedule 200 rates in effect at the time of the calculation for the opt-out charge, escalated at an annual rate of inflation." In another response, PacifiCorp stated that it "does not forecast forward annual depreciation included in Schedule 200."

Petitioner also asserts that the statutes do not allow PacifiCorp "to ignore the effect of depreciation of the existing rate base for a closed pool of generation investments six to 10 years after the opt-out election." In so arguing, petitioner asserts that the typical formula used to calculate revenue requirement generally results in a declining number as a result of accumulated depreciation and declining returns. See OAR 860-038-0005(41) (defining "ongoing valuation" as "comparing the value of the asset output at projected market prices for a defined period to an estimate of the revenue requirement of the asset for the same time period"). However, petitioner does not explain how the direct-access statutes would require use of the revenue requirement formula used by petitioner; nor does petitioner explain how the statutes prohibit the PUC from allowing PacifiCorp to consider "other factors" besides depreciation and return of rate base. See, e.g. , Gearhart v. PUC , 255 Or. App. 58, 63, 299 P.3d 533 (2013), aff'd , 356 Or. 216, 339 P.3d 904 (2014) ("[T]he validity of a particular determined rate is measured, not on the individual theories or methodologies used by the PUC, but on the 'end result' and whether it is just and reasonable."); Wah Chang v. PUC , 256 Or. App. 151, 161, 301 P.3d 934 (2013) (the PUC is not required "to employ any single formula or combination of formulas to determine what are just and reasonable rates" in a case (internal quotation marks omitted)). As a result, we decline to address that aspect of petitioner's statutory argument.

In so concluding, we acknowledge petitioner's concerns that PacifiCorp is in effect including new generation investments in the opt-out charge after year five by the manner in which PacifiCorp has set up the opt-out charge calculation, which increases the generation costs each year in years six through 10. Certain seemingly contradictory statements on the issue by PacifiCorp in its briefing lend support to petitioner's concerns. We, however, must review the PUC's order based on the findings and conclusions that the PUC set forth in that order and not based upon what PacifiCorp may have intended to accomplish with its calculation.

The PUC stated that one of the purposes of the TAM filing was to "identif[y] the proper amount for the transition adjustment for customers wishing to move to direct access service." PUC Order 15-394 at 1.

We reject petitioner's specific substantial evidence challenge to the findings of the PUC that credited PacifiCorp's explanations that "incremental generation is not added after year five," "in real (inflation-adjusted) terms, the fixed generation costs are held constant through year 10." Those findings are supported by substantial evidence in the record based on PacifiCorp's responses to petitioner's data requests, PacifiCorp's illustrative calculations, and PacifiCorp's reply testimony. See 298 Or. App. at 153-54, 153 n. 11, 445 P.3d at 313-314, 314 n. 11.

We recognize that the PUC, under its rules, may take official notice of "[d]ocuments and records in the files of the Commission that have been made a part of the files in the regular course of performing the Commission's duties," if the PUC notifies the parties on the record that it is taking that official notice. OAR 860-001-0460(1)(d), (2). A party may also offer in evidence "all or part of the record from another Commission proceeding." OAR 860-001-0490. The parties have not alerted us to anywhere in the record that the PUC took official notice of documents or records from UE 267, or where a party offered into evidence any portion of that record. Nor have the parties on review pointed to any evidence in UE 267 as a source of substantial evidence for the PUC's findings. Accordingly, our review is confined to the record made in this matter, UE 296. See ORS 183.482(7) ("Review of a contested case shall be confined to the record[.]").

The PUC and PacifiCorp have represented on review that the PUC did not rely on its prior orders as a basis on which to preclude consideration of petitioner's arguments. As a result, we do not address whether issue preclusion could apply in this circumstance. However, given the state of the record and the statements made in the order, we can find no other rational basis for the PUC's findings other than that it relied on the orders in UE 267 as the evidentiary support for PUC Order 15-394.